STATE, ON BEHALF OF LYLE WINDSCHITL, GUARDIAN AD LITEM OF MARLYS THERESA WINDSCHITL, v. JOEL LANDKAMMER.

217 N. W. 2d 494.

April 19, 1974—No. 44215.

*Somsen, Dempsey & Schade* and *William M. Schade,* for appellant.

*Raphael J. Miller,* County Attorney, for respondent.

Heard before Sheran, C. J., and Otis, Scott, and Knutson, JJ., and considered and decided by the court.

SCOTT, JUSTICE.

This is an appeal in a paternity proceeding from an order denying defendant's alternative motion for an order vacating and setting aside the verdict, amending the findings, conclusions, and order for judgment, and granting judgment for defendant or for a new trial. We affirm the trial court.

Following trial, the jury returned a general verdict on October 20, 1972, finding defendant to be the father of an illegitimate child. The action had been commenced for the reasonable expenses of the mother's pregnancy and confinement, including her suitable maintenance for the maximum of 8 weeks prior to and 8 weeks after delivery of the child, and further, for the education and necessary support of the illegitimate child born to Marlys T. Windschitl on July 14, 1972. Minn. St. 257.251.

Pursuant to the jury verdict, the judge ordered defendant to be questioned as to his financial ability to furnish support. He was subsequently ordered to pay the welfare board of Sibley County the amount of $668.20 in two installments; one half by December 1972, one half by February 1973. For the support of the child he was ordered to pay Marlys Windschitl the amount of $40 per month until the child reaches majority or is self-supporting, or until the order is amended by the court. The sole issue on appeal is whether defendant was deprived of his constitutional right to a fair trial because of the refusal of the county attorney to request immunity for defendant and his witnesses.

The county attorney commenced this action under Minn. St. 257.254 in his official capacity at the request of the welfare department. As his first witness, the county attorney called defendant for cross-examination under the rules. After establishing that defendant did in fact know Marlys Windschitl and that

he had seen her on occasions, he was asked whether or not, during the fall of 1971, he had sexual intercourse with Marlys Windschitl. The pertinent part of the testimony disclosed by the record is as follows:

"MR. SCHADE [counsel for defendant]: Well, Your Honor, my instructions are that he does refuse although if the County Attorney will grant him immunity which he has authority to do I will instruct him to answer the question.

"MR. MILLER [county attorney]: The County Attorney is not prepared to grant such immunity, Your Honor.

"THE WITNESS: I refuse to answer on the grounds it might incriminate me."

The next witness was Marlys Windschitl, who testified that she had engaged in sexual intercourse with defendant on approximately 30 occasions during the period from September to December, 1971. She also testified that she gave birth to a male child on July 14, 1972, and that her last previous menstrual period ended on September 30, 1971. Further, she testified that she did not have sexual intercourse with any other person aside from defendant between August 1971 and December 1971. At that time she was 15 years of age. She told defendant in December that she thought she was pregnant, and he allegedly told her that "we will have to work it out." She further testified that defendant came to her home during the last of March, 1972, and in the presence of "[m]y aunt and uncle and my parents and myself * * * [h]e said he was the father of the child, that he did have intercourse with me. My father asked him if he knew of any other guys who did and he said no." She also testified that he said he would pay for it all. Mr. Lyle Windschitl, father of the complaining witness, confirmed this visit to his home in March, as well as other testimony his daughter had given.

Dr. A. F. Duesterhoeft testified that he delivered a normal child conceived about the 8th, 9th, or 10th of October, 1971.

The defendant then called Roger Hahn, who testified that he had been alone with Marlys Windschitl for approximately one-

half hour in mid-September, 1971, and that she had removed part of her clothing. When asked by defendant's lawyer whether or not he had had sexual intercourse with Marlys Windschitl, he answered, "I refuse to answer on the grounds it might incriminate me." The following exchange then occurred:

"MR. SCHADE: Well, Your Honor, will possibly the County Attorney grant immunity?

"MR. MILLER: The County Attorney will not. This man appears to be fully advised before he took the stand. The County Attorney will not."

The next witness called by defendant was Thomas Peterson, who testified that he had also been alone with Marlys Windschitl in an automobile after a dance at the Gibbon Ballroom on the evening of September 10, 1971. The next question led to another request for immunity:

"Q. (Mr. Schade continuing) On this particular evening, Mr. Peterson, when you gave Marlys Windschitl a ride home did you have sexual intercourse with her?

"A. I refuse to answer on the grounds it might incriminate me.

"MR. SCHADE: Will you grant him immunity?

"MR. MILLER: Immunity from what?

"MR. SCHADE: So he can testify what happened?

"MR. MILLER: I am not prepared to grant immunity to any of them."

Defendant's next witness was Bradley Kizer. He testified that he had been at a party at the Windschitl farm in December of 1971, that Marlys Windschitl's parents were present, and that he had spent an hour and a half in a car with Marlys Windschitl. The same pattern was followed:

"Q. (Mr. Schade continuing) Mr. Kizer, on this evening to which we are referring did you engage in sexual intercourse with Marlys Windschitl?

"A. I don't want to answer that question.

"Q. Pardon me?

"A. I don't want to answer that question.

"MR. SCHADE: Will you grant him immunity?

"MR. MILLER: I have already answered you, Counsel, and I think I have made it clear.

"THE COURT: What is the reason for not answering?

"THE WITNESS: It may incriminate me, Your Honor."

Defendant then called his brother, Robert Landkammer, who stated that Marlys Windschitl had been at his house for several hours on October 15, 1971. The record reveals:

"Q. During this two to three hour period that you were alone at your house with Marlys Windschitl did you engage in sexual intercourse?

"A. I refuse to answer on the grounds it may tend to incriminate me.

"MR. SCHADE: You are not willing to grant him immunity?

"MR. MILLER: Hasn't the point been made clear yet, Counsel? I stated and I will state again I will not grant immunity from myself to any of the witnesses you wish to call to the stand."

The record discloses the following upon further questioning of this witness:

"Q. (Mr. Schade continuing) Well, during October of 1971, Mr. Landkammer, were you ever alone with Marlys Windschitl at any other time?

"A. I think I was, but I can't be sure. On one night I was alone with her, but nothing happened."

Mr. Lyle Windschitl was recalled for rebuttal. He stated that he had been home at all times on the night that Bradley Kizer was at the party at his farm, and that Bradley had arrived and departed with his girlfriend, Vanna Messner and that defendant had been with his daughter that night and had left with her. This testimony was produced in open court before the jury.

The constitutional attack upon these proceedings, based upon an alleged denial of due process and equal protection, appears

a bit nebulous. Minn. St. 609.09, subd. 1, with which we are concerned, reads as follows:

"In any criminal proceeding, paternity proceeding, or proceeding in juvenile court, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and if the prosecuting attorney, in writing, requests a judge of the court in which the proceeding is pending to order that person to answer the question or produce the evidence, the judge, after notice to the witness and hearing, shall so order if he finds that to do so would not be contrary to the public interest and would not expose the witness to prosecution in another state or in the federal courts, and that person shall comply with the order.

"After complying, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, he shall not be prosecuted or subjected to penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order, he gave, answered, or produced evidence, but he may be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or in failing to answer, or in producing, or failing to produce, evidence in accordance with the order."

A portion of the Advisory Committee's Comments to the Criminal Code reads as follows (40 M. S. A. p. 100):

"For this purpose it is believed that the Model State Witness Immunity Act prepared by the National Conference of Commissioners on Uniform State Laws provides the best available draft which should be followed. The Model Act was a product of careful consideration and is recommended by Professor McCormick in his work on Evidence, page 287. Recommended § 609.09 represents this model with adaptations to Minnesota and some changes in wording. The words appearing in that section 'if he finds that to do so would not be contrary to the public interest' have been

substituted for the phrase in the Model draft reading 'unless it finds that to do so would not be clearly contrary to the public interst.' This will make the grant of immunity dependent upon such a finding rather than upon the absence of such a finding. The section as recommended fully meets the constitutional requirements."

Although the statute differs somewhat from that originally recommended, having been amended since, the purpose, effect, and application of such a statute is discussed thoroughly by the United States Supreme Court in Malloy v. Hogan, 378 U. S. 1, 84 S. Ct. 1489, 12 L. ed. 2d 653 (1964) and in Murphy v. Waterfront Commission, 378 U. S. 52, 79, 84 S. Ct. 1594, 1609, 12 L. ed. 2d 678, 695 (1964), which reads in pertinent part:

"* * * We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity."

It is clear from the above opinions that this statute compelling testimony is a "tool" designed to assist the prosecutor, and has been accepted as part of both Federal and state procedure as constitutionally sound. It is difficult to construe the statute to mean something other than that which effectuates the true purpose for which it was enacted.

A reading of the statute will make it clear that immunity is granted by the court, not the county attorney. It is inconceivable that immunity would be recommended by the prosecutor and granted by the court without a thorough investigation of the witness to determine the extent of his involvement. Other-

wise, and particularly in a situation of surprise as presented here, no one is apprised of which particular crimes the witness is going to admit. To ask the court to forgive a witness of his crimes without knowing what crimes are to be forgiven is a very serious request. Such an application would lead to chaos in most cases because of the possible far-reaching effect of granting it.[1]

If defense counsel did not know until trial that the witnesses would refuse to state whether they had had sexual intercourse with Marlys Windschitl unless they were granted immunity, this was knowledge he could have acquired by use of the discovery procedures of the Rules of Civil Procedure. It seems more likely that making requests for immunity when the witnesses refused to testify at trial was a trial tactic that failed. In any event, it is apparent that, whatever the defense was attempting to accomplish, the intended implication that Marlys may have had sexual intercourse with others than defendant was presented to the jury through each witness' claiming the protection of the Fifth Amendment. Even with this implication, the jury concluded that defendant was the father of this child. It is difficult to believe that defendant was in some way prejudiced by the actions of the county attorney.

The more modern course for defense counsel would have been to apprise the county attorney or the court before trial of the information sought to be obtained through the requested grants of immunity in order to allow a determination of the authenticity of the information and to assure fairness to all concerned. In such matters, the usual procedure is that counsel avail themselves of all the rules of discovery. We suggest also that they should no longer deal at arm's length.

---

[1] "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." Murphy v. Waterfront Commission, 378 U. S. 52, 79, note 18, 84 S. Ct. 1594, 1609, 12 L. ed. 2d 678, 695 (1964).

We feel that the jury, in effect, had all the pertinent information available before it deliberated and that the evidence is sufficient to sustain the verdict, and therefore affirm.

Affirmed.