**In the Matter of the WELFARE OF S.A.V. and S.M.V.**

No. C2–85–2240.

Court of Appeals of Minnesota.

Aug. 12, 1986.

Daniel L. Giles, Christianson, Stoneberg, Giles & Myers, Marshall, for appellant L.V.

Cecil E. Naatz, Marshall, for appellant B.V.

Patrick J. Leary, Quarnstrom, Doering, Pederson, Leary & Murphy, Marshall, for Guardian ad Litum.

Kathleen A. Kusz, Asst. Lyon Co. Atty., Marshall, for respondent Region VIII North Welfare.

Heard, Considered, and Decided by FORSBERG, P.J., and SEDGWICK and RANDALL, JJ.

## OPINION

SEDGWICK, Judge.

S.A.V. and S.M.V. were adjudicated dependent children pursuant to Minn.Stat. § 260.015, subd. 6(d) (1984). The parents appeal, challenging the adjudication of dependency and the dispositional order. We affirm.

## FACTS

S.A.V. and S.M.V. are the twin daughters of B.V. (father) and L.V. (mother). The twins were born in July 1985 and were approximately eleven weeks old at the time of the relevant events.

On October 2, 1985, S.M.V. was taken to the local hospital in Marshall, Minnesota by her parents. Dr. Jewett, the physician who examined her, suspected that S.M.V. was suffering from spinal meningitis, so transferred her to Sioux Valley Hospital in Sioux Falls, South Dakota for further testing.

The physician at Sioux Valley Hospital concluded that S.M.V. had suffered brain damage resulting in seizures. In addition, retinal hemorrhage and bruises were noted. During the course of her hospitalization, doctors discovered chip fractures of her arms and legs, a fracture of the fibula, and several rib fractures. Based upon the nature and extent of S.M.V.'s injuries, her physician became concerned that she had been physically abused.

As a result of the concern regarding S.M.V.'s injuries, S.A.V. was examined by Dr. Jewett. Dr. Jewett found some bruising, chip fractures of the arms and legs, a fractured fibula, and rib fractures. Based on the physicians' reports and investigatory reports, a dependency petition was filed.

Three physicians testified at the dependency hearing: Dr. Jewett, Dr. Blake (from Sioux Valley Hospital) and Dr. Ophoven (a forensic pathologist). All three physicians were of the opinion that the children had been abused. They testified that, although fractures in infants are difficult to detect, it would be highly unlikely that the children would not be irritable and fussy due to their broken bones. Dr. Blake testified that the arm and leg fractures could only have been caused by vigorous pulling or twisting of the extremities; they could not have been caused accidentally.

Dr. Blake testified that S.M.V.'s leg fracture occurred at least two weeks before he examined her, but that her rib fractures were more recent. He was unable to date the chip fractures. He concluded that the bruises were also recent. Dr. Jewett found that S.A.V.'s fractures had probably occurred about two weeks before he examined her.

Neither parent provided an explanation for the children's injuries. All witnesses denied ever having seen abuse perpetrated on the children and also denied having noticed any symptoms of abuse. The parents admitted a period of time when both children were somewhat fussy, but attributed it to gastric problems. The fussiness ceased after the children's formula was changed. Both parents denied injuring the children themselves and denied any knowledge of abuse by the other.

Mother was unemployed and spent most of her time at home with the children. She was out of the home for only about two to three hours per week. Father was employed full time during the summer months and was a student in the fall. He was out of the home about 25 hours per week. The twins were rarely left with babysitters.

After waiving his privilege against self-incrimination, father testified regarding what happened the morning S.M.V. was

taken to the hospital: He was at home alone with the twins while mother ran some errands. The twins were sitting on the floor in infant seats while he did some schoolwork. When he got up to go to the bathroom, he tripped over S.M.V.'s infant seat, jarring her. He readjusted her seat and returned to the bathroom. When he returned from the bathroom, he noticed that S.M.V. was not breathing. He removed her from the seat and tried to revive her. He described moving her from side to side in a rotating motion, but denied shaking her back and forth (toward and away from himself). She finally resumed breathing when he gave her mouth to mouth resuscitation. He then placed her in the infant seat again and resumed working on his schoolwork.

When mother returned approximately ten minutes later, father told her what had happened. S.M.V. was palish yellow and emitted a high-pitched cry at that time. Mother called her mother, who, upon observing S.M.V., said she should be taken to the hospital. The parents then took S.M.V. to the hospital.

Father speculated that his resuscitative efforts may have caused S.M.V.'s brain injuries. Dr. Blake, on the other hand, testified that the injuries could not have been caused by the resuscitative efforts. To cause injuries such as S.M.V.'s, a child would have to be shaken violently forward and backward, causing blood vessels to tear and the brain to strike the back and front of the skull.

The trial court made detailed findings regarding the children's injuries. The court found that S.M.V.'s brain injury most likely caused her to stop breathing. The court further found:

22. That the injuries are so extensive and so severe a nature to [S.A.V. and S.M.V. they] should have been apparent to anyone who provided care to them because of the manifestation of irritability and discomfort by the children.

23. That the injuries to [S.A.V. and S.M.V.] were caused by either [mother or father] or by both of them and by no one else; and that if the injuries were caused by one and not the other of the parents, then with the knowledge of the other parent.

Thus, the court concluded that the twins were dependent children within the meaning of Minn.Stat. § 260.015, subd. 6(d) because they were without proper parental care due to the emotional disability and state of immaturity of their parents. The court further concluded that the children were at risk of further injury if returned to their parents without intervention to help them overcome their parenting deficiencies.

In its dispositional order, the court continued legal custody in the welfare department and placement of the children in foster care with the mother's brother and sister-in-law, subject to visitation by the parents. The court found as a fact:

That the parents need to acknowledge the causes of the children's injuries before any meaningful change will occur in the care and treatment they provide to the children.

The court then ordered that the welfare department prepare a plan for the psychological or psychiatric evaluation of the parents and that the parents "cooperate fully in the evaluation process." The parents were also ordered to participate in counseling and parenting classes.

## ISSUES

1. Is the evidence sufficient to support a finding that S.A.V. and S.M.V. were dependent children within the meaning of Minn.Stat. § 260.015, subd. 6(d)?

2. Does the dispositional order requiring the parents to "cooperate in the evaluation process" violate father's constitutional right to be free from compelled self incrimination?

## ANALYSIS

1. A child is dependent if he or she "is without proper parental care because of the emotional, mental, or physical disability, or state of immaturity of his parent * * *." Minn.Stat. § 260.015, subd. 6(d)

(1984). Because a parent is presumed to be fit to care for his or her child, allegations of dependency and neglect must be proved by clear and convincing evidence. *In re Welfare of R.A. and J.A.*, 375 N.W.2d 578, 580 (Minn.Ct.App.1985) (citations omitted); Minn.R.Juv.P. 59.05. The standard of appellate review is whether the trial court's findings are "supported by substantial evidence and are not clearly erroneous." *In re Welfare of J.M.S.*, 268 N.W.2d 424, 428 (Minn.1978) (citations omitted). Where more than one child is involved, the findings must be reviewed with respect to each child. *Welfare of R.A.*, 375 N.W.2d at 580.

The parents quarrel with the trial court's finding that they either perpetrated the abuse, or knew or should have known of abuse perpetrated by the other. Both parents argue that this finding is not supported by the evidence. We cannot agree.

■ The evidence makes it painfully clear that these children were repeatedly abused. It is also clear that one or both of the parents is responsible for the children's injuries. Each of the children sustained multiple injuries. The evidence indicates that the injuries occurred on more than one occasion. Moreover, because the parents were the primary caregivers, it does not appear that the injuries were caused by anyone other than the parents. Finally, experts testified that it would be highly unlikely for children with broken bones not to display some symptoms, such as irritability or fussiness. It defies belief, given the severe nature of the injuries involved here, that a parent would not know that something was wrong with the children.

■ The evidence adequately supports the trial court's findings and conclusion that each of these children is dependent. The statute requires that the petitioner show that the children are without proper parental care because of emotional or mental disability, or immaturity of a parent. There is clear evidence that these children were abused. This fact alone is sufficient to establish that the children were without proper parental care. Abuse by a parent, or knowledge of abuse by another without

taking corrective action is clear evidence of emotional disability or immaturity of a parent.

2. Appellant father argues that the dispositional order infringes on his right to be free from compelled self-incrimination. He argues that the requirement that he cooperate with psychological evaluation compels him to incriminate himself and enhances the threat of criminal prosecution.

■ The privilege against self-incrimination applies in civil as well as criminal proceedings. *Parker v. Hennepin County District Court*, 285 N.W.2d 81, 82–83 (Minn.1979) (citations omitted); *see also Minnesota State Bar Association v. Divorce Assistance Association*, 311 Minn. 276, 248 N.W.2d 733 (1976). If testimony in a civil action would enhance the threat of criminal prosecution, the privilege may be invoked. *Parker*, 285 N.W.2d at 83. An individual may not be compelled to testify absent a grant of immunity from use of the statements in any subsequent prosecution. *Lefkowitz v. Turley*, 414 U.S. 70, 77–78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) (citing *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)).

The United States Supreme Court has held that a state may not exact a penalty for refusal to waive immunity. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (removal and five-year bar from public office for refusal to waive immunity is unconstitutional); *Uniformed Sanitation Men Association v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (termination from public employment for refusal to waive immunity held unconstitutional); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (dismissal of police officer for refusal to sign a waiver held unconstitutional); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (statements given by police officers faced with termination for refusal to answer could not be used in subsequent criminal prosecution).

We recognize that appellant in this case may not be forced to waive his privilege to be protected from compelled self-incrimination. At the same time, we do not view this case as one in which the state is attempting to impose an unconstitutional penalty upon appellant or as posing an unconstitutional choice. The Supreme Court has recently stated:

In each of the so-called "penalty" cases, the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions "capable of forcing the self-incrimination which the Amendment forbids."

*Minnesota v. Murphy,* 465 U.S. 420, 434, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409 (1984) (quoting *Lefkowitz v. Cunningham,* 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977)).

The "penalty" cases have no applicability here. Appellant has not been threatened with sanctions for refusing to waive his privilege. Appellant has not been placed in a situation in which the state has required him to either waive immunity and testify or suffer dire consequences. In fact, appellant has not demonstrated that he has been faced with a situation in which he has sought to exercise his privilege.

While recognizing appellant's rights in this matter, we also recognize the state's interest and the children's rights. The state has both a strong interest and a mandate to protect these children from an environment where they have suffered brain damage and repeated fractures. The state is required to work with the parents to correct the conditions which caused the abuse with the aim of returning the children to the parents as soon as this can be done safely. *See In re Welfare of Solomon,* 291 N.W.2d 364 (Minn.1980); Minn. Stat. § 260.221(b)(5) (1984). However, if appellant refuses to cooperate in the process, or is unable or unwilling to correct

the behavior that led to the abuse, the children cannot be returned safely to his custody.

■ Termination of appellant's parental rights is a very real possibility if he does not cooperate with counseling because the state will be unable to work with him toward resumption of his parental responsibilities. The trial court's finding that the parents need to recognize the cause of the children's injuries before any meaningful change can occur recognizes that a parent who acknowledges the need for professional help is more amenable to treatment than one who denies the need for help. *See, e.g.,* S. O'Brien, *Child Abuse* 124 (1980). Termination in such a situation is not, however, a sanction for exercise of a constitutional right, but simply the necessary result of failure to rectify parental deficiencies. Although the state cannot require appellant to waive his constitutional right, that does not mean it must relinquish its right and obligation to protect these children.

### DECISION

The evidence is sufficient to support a finding of dependency as to each child. The dispositional order does not violate appellant's right to be free from compelled self-incrimination.

Affirmed.

RANDALL, Judge, dissenting.

I concur in the majority result on issue one, namely, whether the record displays evidence sufficient to affirm the trial court's finding that S.A.V. and S.M.V. were dependent children within the meaning of Minn.Stat. 260.015, subd. 6 (1984). I agree that it does.

The second issue is whether the dispositional order requiring appellant father[1] to cooperate with the welfare department *and* acknowledge the cause of the children's injuries may violate the father's constitu-

---

1. Only appellant father contested that part of the dispositional order requiring acknowledg-

ment of the cause of the children's injuries.

tional rights against self-incrimination under the fifth amendment to the U.S. Constitution and the Minnesota Constitution, Art. I, Sec. 7. I disagree with the majority's conclusion that the court order in question did not impinge on appellant's constitutional rights. I also disagree with that portion of the majority opinion which goes on to state that if appellant refuses to "cooperate" in the counseling process, the children cannot safely be returned to him and his parental rights can be terminated.

Those statements are purely conclusionary and beg the question: Why is appellant's right to be free from compelled testimony against himself in a criminal case diametrically opposed to his rights as a parent? I find the federal constitution and Minnesota law broad enough to encompass the fifth amendment, the best interests of the children, and appellant's rights as a parent at the same time.

The majority claims that the penalty cases have no applicability here because sanctions have not *yet* been threatened or imposed. I agree that appellant has not yet formally applied for immunity and been denied it; that appellant has not yet formally invoked his fifth amendment rights; and that the sanction of termination of parental rights had not, at this time, been imposed for invoking the fifth amendment. However, after implying that the constitutional issue is not before the court because it is not ripe, the majority opinion goes ahead and decides that issue. The majority holds that even if appellant's parental rights are terminated, that somehow does not constitute an impermissible sanction for invoking the fifth amendment. I agree that the fifth amendment issue should be addressed. It was briefed and argued to this court by both parties and presents a compelling issue. I disagree with the majority's interpretation of the facts as applied to the fifth amendment.

At the conclusion of the evidence, the court adjudicated the children dependent, continued their legal custody in the welfare department, ordered the welfare department to prepare a plan for the psychological evaluation of the parents, and ordered the parents to sign the appropriate releases. The court then went on to require the parents to cooperate fully in the evaluation process, and made as a finding of fact:

> *That the parents need to acknowledge the causes of the children's injuries* before any meaningful change will occur in the care and treatment they provide to the children.

(Emphasis added).

Appellant argues that both the United States and Minnesota constitutions prohibit a person, absent grant of immunity, from being bound in any proceeding to answer a question that would expose or have a tendency to expose that person to a criminal charge. U.S. Const. amends. V, XIV; Minn.Const. art. I, § 7.

In *Parker v. Hennepin County District Court*, 285 N.W.2d 81 (Minn.1979), the supreme court reviewed a civil trial court order which deemed "admitted" allegations in a documentary request for admissions. The party being asked to respond to the request did not respond, asserting the fifth amendment privilege. The trial court "deemed the allegations admitted" despite the claim of fifth amendment rights, and the Minnesota Supreme Court affirmed.

The supreme court was careful to point out that deeming unanswered allegations admitted for purposes of civil litigation is a procedural device under the Rules of Civil Procedure, and those *"[a]dmissions have no life outside the pending litigation and cannot support a subsequent criminal prosecution,* nor have any other collateral effect. Minn.R.Civ.P. 36.01." *Parker*, 285 N.W.2d at 83–84 (emphasis added).

The supreme court was careful not to state that the trial court could order a person to answer affirmatively in the face of a claim that the answer would violate their fifth amendment rights, but only pointed out that in a civil case where parties seek the use or protection of the civil courts for their own purposes, they cannot answer or testify when it serves their purposes but reserve the right not to testify when it does not.

In *Parker*, the court reiterated the long-standing principle that the fifth amendment

> may only be invoked when testimony in a civil case would enhance the threat of criminal prosecution such that reasonable grounds exist to apprehend its danger. *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Blau v. United States*, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950).

*Parker*, 285 N.W.2d at 83. Respondent in this case concedes that a real threat to appellant of criminal prosecution exists. Thus, the fifth amendment issue is real. The majority opinion, while acknowledging the correctness of *Parker*, goes on to come down with a legal conclusion contrary to *Parker*.

Had appellant been granted immunity[2] from criminal prosecution, the trial court's order would be appropriate and enforceable, but such immunity was not requested by respondent even though respondent was fully aware of the constitutional problem.

At oral argument respondent agreed that the matter of immunity had been discussed in the county attorney's office, but the decision was not to request immunity. Respondent argues that the issue is not ripe because any admissions appellant might make are conjectural, and, further, that because appellant took the stand at a hearing, he might have waived his fifth amendment rights. I disagree. In response to questioning, respondent concedes that from the nature of the children's injuries, a clear felony charge would lie against the perpetrator(s),[3] and respondent maintains that they have the right to prosecute either parent for felonious assault if either parent states that he or she caused the injuries.

In examining that portion of the trial court's order quoted above, the only logical interpretation is that the trial court is insisting, as a part of parent/child therapy, on an affirmative admission by the parents that they had caused the injuries. If the court insists on that affirmative admission, immunity from criminal prosecution must be granted to the parents to avoid a violation of their fifth amendment rights.

The court's dispositional order was made in a setting where appellants' children had just been adjudicated dependent. The court told appellants what they needed to do in the future to avoid permanent termination of their parental rights. That brings to the surface this precise issue. Should the trial court decline to grant immunity but continue to insist on an affirmative acknowledgement of those injuries, can the trial court terminate appellants' parental rights if they choose to continue to assert the fifth amendment privilege? It appears to me that the trial court cannot terminate appellant's parental rights solely[4] on the grounds that he refused to answer in the absence of a grant of use immunity.

In *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977), an

---

2. A judge, not the prosecutor, is the person who actually confers the grant of immunity. The grant is normally preceded by a request for immunity from the prosecutor who determines the testimony he wants compelled to be relevant to the pending matter. Minn.Stat. § 609.09 (1984). *See State ex rel Windschitl v. Landkammer*, 299 Minn. 184, 217 N.W.2d 494 (Minn. 1974) ("immunity is granted by the court, not the county attorney"); *State v. Saliterman*, 276 Minn. 560, 150 N.W.2d 699 (Minn.1967). The record does not disclose that the county attorney's office in the case in bar formally requested the trial court to require the parents to acknowledge that they caused the children's injuries. It appears to have been an independent decision of the trial court to require the parents to do so. Although being fully apprised of the court's order, and although fully cognizant of its effect, and although reserving to themselves the right to charge any parent admitting participation in the injuries with a felony assault, the county attorney's office so far has declined to request immunity for appellant.

3. The county attorney's office feels the facts and injuries warrant a charge of felony assault. Appellant, although claiming the State has not so far proved his involvement, does not dispute the extent of the injuries.

4. The question of appellant's fitness as a parent will not be decided until the dependency period and the evaluation process have been completed. That issue is not before us. This dissent is restricted to the fifth amendment issue.

officer of a political party in New York State took the fifth amendment in the face of a statute requiring party officers to appear before grand juries to testify about their conduct of their party office. If the officers refuse to answer or decline to waive immunity from the use of testimony in later prosecutions against them, the statute immediately discharged the officer. The Supreme Court held that such a penalty violated the fifth amendment. The court used language characterizing as unconstitutional "potent sanctions," "substantial penalties," and "a sanction." Among the reasons for the decision:

> [W]hen a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment and cannot be used against the declarent in a subsequent criminal prosecution.

*Lefkowitz*, 431 U.S. at 805, 97 S.Ct. at 2135.

> [G]overnment cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony *which has not been immunized.* * * * Direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids.

*Lefkowitz*, 431 U.S. at 806, 97 S.Ct. at 2136 (emphasis added). The court emphasized that discharge from employment was not a permitted sanction for exercising fifth amendment rights, citing *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) and *Uniformed Sanitation Men Association v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968).

It seems plain that if loss of employment and party office are severe enough sanctions to infringe impermissibly on constitutional rights, so would be the loss of appellant's parental rights should the court continue to require appellant to admit that he injured his children, but terminating his parent/child relationship if he refuses to make the admissions without assurances of immunity. The United States Supreme Court case of *Lefkowitz* is contrary to that part of the majority opinion that holds that the penalty of termination of parental rights is appropriate if appellant refuses to "cooperate" without a grant of immunity.

The majority attempts to distinguish the case at bar from *Lefkowitz* by stating, "The penalty cases have no applicability here." The majority then reasons that *Lefkowitz* does not apply because no sanctions have yet been imposed upon the father. This point is inconsistent with the majority's decision to go ahead and address the fifth amendment issue and hold against appellant. The fact that sanctions have not yet been imposed concerns ripeness of the issue, not the merits.

The majority opinion simply does not follow the line of reasoning on the fifth amendment issue set out in *Parker* and *Lefkowitz*. Loss of parental rights is a sanction at least as severe as loss of employment and party office.

The majority acknowledges in effect that *this is* a penalty case by stating, "If appellant refused to cooperate * * * the children cannot be returned safely to his custody." That is exactly the penalty I call attention to in this dissent. Even though the penalty has not yet been formally applied to appellant, the constitutional dimensions of such a penalty were raised in the record, addressed in part by the parties, and should be decided now.

The majority opinion actually concedes the fifth amendment issue as the majority states:

> We recognize that appellant in this case may not be forced to waive his privilege to be protected from compelled self-incrimination.

Yet somehow the majority goes on to hold against appellant based on the seriousness of the children's injuries and the interest of the State in protecting children. Neither the seriousness of the injuries nor the State's obvious right to be concerned about children were ever at issue. The fact of injuries is not in dispute and no one ques-

tions the jurisdiction of the trial court to enter a dependency order.

I do not suggest that the children should be returned to appellant father's custody absent a strong showing that he can correct the behavior which created the situation of dependency and otherwise demonstrate that he is a fit and proper parent. The precise issue addressed is not whether there was child abuse in this case (there was, by someone), but whether the sanction of terminating parental rights may be imposed *solely* because a party invokes the fifth amendment in the face of criminal prosecution.

The simplest solution would be to grant use immunity to appellant. This would achieve the desired effect of allowing appellant to discuss freely with therapists, doctors, and the welfare department his conduct and actions pertaining to his children, his feelings about them, and what course of conduct he perceives himself pursuing in the future to better the parent/child relationship. No good purpose can be served by withholding immunity if the trial court and respondent State are serious that an affirmative admission by appellant that he caused the injuries is a prerequisite to therapy.

The best interests of children generally lie, absent compelling evidence to the contrary, in the continuation of the parent/child relationship. There is

> a presumption that a natural parent is a fit and suitable person to be entrusted with the care of his or her child and that it is ordinarily in the best interest of the child to be in the custody of his or her natural parents.

*In re J.J.B.*, 390 N.W.2d 274, 277 (Minn. 1986). *See also In re H.G.B.*, 306 N.W.2d 821, 825 (Minn.1981) ("fundamental rights of parents to the custody and companionship of their children should not be taken from them except for grave and weighty reasons"); *In re Chosa*, 290 N.W.2d 766, 769 (Minn.1980 ("presumption that a natural parent is a fit and suitable person to be entrusted with the care of a child").

I do not see any governmental need in requiring appellant to make affirmative admissions without the grant of immunity. Further, I point out that in *Lefkowitz* the Supreme Court "rejected the notion that citizens may be forced to incriminate themselves because it serves a governmental need." *Lefkowitz*, 431 U.S. at 808, 97 S.Ct. at 2137.

I dissent on this issue and would remand the case to the trial court to consider either granting immunity to appellant or withdrawing that part of its order requiring the parents to acknowledge the cause of the children's injuries. If the court chooses not to grant immunity, the parents can still partake of meaningfull therapy without having to explicitly admit they participated in a felony and risk criminal prosecution.