737 A.2d 1179 (1999)
325 N.J. Super. 150
In the Matter of the GUARDIANSHIP OF D.J.M.
Superior Court of New Jersey, Chancery Division, Family Part, Hudson County.
Decided July 7, 1999.
*1180 John Farmer, Jr., Attorney General for New Jersey Division of Youth and Family Services (Marcia Goldstein, Deputy Attorney General, attorney).
Kathleen F. Gahles, Neshanic Station, for D.A.M.
O'SHAUGHNESSY, J.S.C.
The issue before this Court is whether to stay a guardianship proceeding pending the outcome of a simultaneous criminal proceeding arising out of the same facts.
Guardianship proceedings are not typical civil actions. Indeed, they are the most weighty and often the most heart wrenching cases that a Superior Court, Family Part judge has to decide. The termination of an individual's parental rights is permanent, and the impact extends not only to the parents but to extended family members.
On July 14, 1998, a verified complaint was filed by the Attorney General's Office on behalf of the Division of Youth and Family Services ("DYFS"). The Attorney General petitioned the court for an order terminating the parental rights of D.A.M. (a.k.a.D.O.) and D.R.M. and granting guardianship of the minor, D.J.M., to DYFS. The court signed an order to show cause ordering the defendants to appear on September 15, 1998, and show cause why an order should not be entered terminating their parental rights. Hearings were held on September 15, 1998, and November 10, 1998. Defendants failed to appear at both hearings because they were not properly served. At a hearing on December 15, 1998, a default judgment was entered against the natural father D.R.M. The hearing, scheduled for January 5, 1999, was continued to permit the appointment of a law guardian for the child. The matter was rescheduled for February 23, 1999, and subsequently adjourned with the consent of the Deputy Attorney General ("DAG"). The parties appeared before this court for the first time on April 7, 1999. Defendant's counsel requested an adjournment of the hearing due to a personal emergency which was granted, and a hearing was rescheduled for April 28, 1999. Defendant petitioned the court for a stay of the guardianship proceeding pending the outcome of the simultaneous criminal proceeding. The court ordered both parties to submit briefs within seven days and rescheduled the hearing for oral argument. On May 19, 1999 the court heard oral argument on Defendant's motion and ordered the DYFS caseworker to give D.A.M. a recent photo of D.J.M. and current school information.
The Defendant, D.A.M., has an lengthy history with DYFS. According to the complaint, D.A.M.'s initial involvement with DYFS began on May 17, 1995, when DYFS received a referral alleging that D.A.M. struck D.J.M. in the face at a *1181 parent-teacher conference. On August 6, 1995, DYFS filed an abuse and neglect complaint against D.A.M. She failed to appear on the scheduled court date resulting in an order that if she failed to appear at the next hearing a warrant would issue. On October 31, 1995, the Defendant failed to appear and the Court issued a bench warrant. During this period, DYFS received several referrals alleging that D.J.M. frequently had bruises on his body including a black eye and had a number of unexcused absences from school. The allegations as to the black eye and bruises were unsubstantiated. On January 5, 1996, DYFS was notified by truant officers that D.J.M. had been absent from school since December 12, 1995, and that they were planning to charge D.A.M. for her son's truancy. On February 8, 1996, D.J.M. was removed from his home, and D.A.M. was arrested and incarcerated in the County Jail. D.A.M. was subsequently ordered to cooperate with DYFS, to undergo a substance abuse screening and psychological evaluation and to receive therapy. The complaint asserts that D.A.M. was receptive to joint therapy with her son, and DYFS opined that she was making progress. During a counseling session on September 30, 1996, however, D.J.M. disclosed that both his mother and maternal grandfather, L.O., had sexually abused him. Criminal charges were subsequently filed against D.A.M. and L.O. On the advice of counsel, D.A.M. thereafter ceased communicating with DYFS and refused to accept any services.
In addition to the allegations of abuse and neglect, the DYFS complaint further alleges that D.A.M. has a history of substance abuse and dysfunctional relationships. The DAG asserts that D.A.M. failed to protect D.J.M. and/or sexually abused him herself.
The Defendant wishes to stay this guardianship proceeding pending the outcome of the criminal action. She asserts that guardianship actions are coercive by nature. As such, asking her to choose between self-incrimination and her child is violative of the Fifth Amendment. The DAG acknowledges that pursuant to N.J.S.A. 9:6-8.10(a), DYFS is obligated to provide its records to the County Prosecutor and that transcripts of the proceeding would be similarly available to the State for use in the criminal trial. The DAG contends, however, that the focus of the guardianship proceeding must be the safety of the minor, D.J.M., and that his interests are paramount to those of his biological mother.

I.
On March 31, 1999, Governor Christine Todd Whitman signed into law Senate Bill 1705 which effectively amended Title 9 and Title 30 to conform to the Federal Adoption and Safe Families Act of 1997 ("ASFA"). The bill was introduced on February 18, 1999, and the legislative statement preceding the proposed bill highlighted its principal tenet with the following statement: "The bill clearly establishes as public policy in Titles 9 and 30 of the Revised Statutes that the safety of children shall be the paramount concern, expanding the current State policy which protects a child's best interests." Senate Judiciary Committee Statement to Senate Bill No. 1705 (1999). This law mandates that a child's health and safety be the paramount concern and places a priority on permanency for the child. The Appellate Division also acknowledged, in passing, that the ASFA "[S]eems to place a greater degree of emphasis upon permanency by imposing reduced time limits, under certain circumstances, upon the duration of foster care and the timely freeing of foster care children for adoption." In the Matter of Guardianship of K.H.O., 308 N.J.Super. 432, n. 3, 706 A.2d 226 (App. Div.1998).
One of the primary goals of Congress in passing ASFA was to reduce the amount of time children spend in foster care. Congress recognized that children who are placed in foster care are often transferred *1182 from foster care to the natural parents and back into foster care multiple times. The instability that inherently results from these multiple placements can permanently affect a child's psyche. While foster care serves a valuable purpose, prolonged it can have a negative psychological impact on the child(ren). "Even in a loving, long term foster home, the uncertainty of the foster status may cause hardship." Robert M. Gordan, Drifting through Byzantium: The Promise and Failure of the Adoption and Safe Families Act of 1997, 83 Minn. L.Rev. 637, 655 (1999)(describes Congress's intentions and argues for the need to consider further reforms to implement effectively the law).
The New Jersey Legislature's adoption of ASFA clearly expresses its desire to expedite these proceedings. In the most notable amendment to N.J.S.A. 30:4C-15, DYFS is required to file for termination as soon as any one of the five standards for termination is met and "[N]o later than when the child has been in placement for 15 of the most recent 22 months," unless an exception applies. This amendment effectively provides a time frame within which the natural parents must demonstrate that they are capable of being nurturing caregivers or risk losing their children forever. Additionally, the statute requires that a final hearing be held within three months from the date the petition is filed. N.J.S.A. 30:4C-15.2 (emphasis added). The amendments made to Title 30 demonstrate that once a guardianship complaint is filed, the Legislature clearly intends that there be a prompt resolution. Distilled to its essence, the adoption of ASFA shifted the focus from reunification with the biological parents to the safety of the child(ren).

II.
The Fifth Amendment right against self-incrimination as applied to the states under the Fourteenth Amendment grants individuals the right to decline to answer questions in any proceeding "civil or criminal, formal or informal, where the answers might incriminate [this individual] in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973); Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409, 418 (1984) (quoting Lefkowitz at 77, 94 S.Ct. 316); Banca v. Town of Phillipsburg, 181 N.J.Super. 109, 114-15, 436 A.2d 944 (App.Div.1981); New Jersey Div. of Youth & Family Servs. v. S.S., 275 N.J.Super. 173, 179, 645 A.2d 1213 (App.Div.1994). The touchstone of the Fifth Amendment is compulsion. The inquiry must, therefore, focus on whether an individual has been put in a position that by its very nature is so coercive, due to either physical or psychological factors, that it compels the individual to make an incriminatory statement involuntarily. Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Garrity, several New Jersey police officers were questioned as part of an investigation of alleged traffic ticket fixing. The officers were advised that any statements made might be used against them in a criminal proceeding and that they could refuse to answer questions that might tend to incriminate them. They were also advised, pursuant to a state statute, that if they chose to invoke the Fifth Amendment, their refusal to answer the questions would subject them to removal from office. The officers answered the questions. The State subsequently brought charges against the officers for conspiracy to obstruct the administration of traffic laws. Their prior statements to the investigators were admitted into evidence, over their objection, and the officers were convicted. The Supreme Court held, "There are rights of a constitutional stature whose exercise a state may not condition by the exaction of a price." Garrity, 385 U.S. at 500, 87 S.Ct. at 620, 17 L.Ed.2d 562. In short, the officers were made to choose between self-incrimination and job forfeiture. Duress inherently exists when statements *1183 are secured in this manner. Justice Douglas, writing for the majority, reasoned that such a choice was one between "the rock and the whirlpool" and violative of the Fifth Amendment. Id. at 498, 87 S.Ct. 616, quoting, Stevens v. Marks, 383 U.S. 234, 243, 86 S.Ct. 788, 15 L.Ed.2d 724 (1966).
The New Jersey State Constitution does not expressly provide for a right against self-incrimination. The right is derived from our common law and has been subsequently codified in our statutes and rules. State v. P.Z., 152 N.J. 86, 100, 703 A.2d 901 (1997); State v. Reed, 133 N.J. 237, 250, 627 A.2d 630 (1993); See N.J.S.A. 2A:84A-19; N.J.R.E. 503. The absence of express constitutional articulation in no way diminishes its significance. P.Z., supra, 152 N.J. at 100, 703 A.2d 901; Reed, supra, 133 N.J. at 250, 627 A.2d 630. "The privilege is not self-executing under either federal or state law and must be invoked by anyone claiming its protection". P.Z., supra, 152 N.J. at 101, 703 A.2d 901; Reed, supra, 133 N.J. at 251, 627 A.2d 630; See, Murphy, supra, 465 U.S. at 428-29, 104 S.Ct. at 1142-43, 79 L.Ed.2d at 419-20. Generally, when the privilege is not asserted and the person questioned chooses to answer, the choice to respond is considered voluntary. Murphy, supra, 465 U.S. at 429, 104 S.Ct. at 1143, 79 L.Ed.2d at 420; P.Z., supra, 152 N.J. at 101, 703 A.2d 901; State v. Fary, 19 N.J. 431, 435, 117 A.2d 499 (1955). There are exceptions to this axiom. The most notable exception was articulated by the United States Supreme Court when it held that a custodial interrogation by lawenforcement officers is inherently coercive, automatically triggering the Fifth Amendment. Miranda, supra, 384 U.S. at 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
While the exercise of the Fifth Amendment privilege is a basic constitutional right, its application is not absolute. It is a fact-sensitive inquiry and no case law in New Jersey directly addresses the issue to be decided by this court. Therefore, this Court has looked to other states for guidance. It should be noted that while other jurisdictions addressed the issue from different perspectives, common themes emerged.
The Montana Supreme Court addressed an appeal from a defendant who alleged that the State compelled him to testify at his termination proceeding because, if he failed to testify, he would risk the loss of his child. In the Matter of Declaring C.L.R., Youth in Need of Care, 211 Mont. 381, 385, 685 P.2d 926, 928 (1984). The Court held that no violation of the Fifth Amendment occurred because Appellant was not compelled to testify Id. at 387, 685 P.2d 926 (emphasis added). "Appellant clearly could remain silent if he so desired without fear of certain penalty for not testifying. Appellant's determination to testify hinged upon a tactical decision and not a penalty of certain loss of parental rights." Ibid. The Montana Supreme Court cited favorably the New York case, Matter of Roman, 94 Misc.2d 796, 405 N.Y.S.2d 899 (1978), which addressed a similar issue. In Roman, the State was attempting to establish that the child at issue suffered abuse and neglect at the hands of his natural mother and a live-in boyfriend. The New York court presaged the Montana rationale that no compulsion had occurred which violated the defendant's Fifth Amendment rights. The Montana Supreme Court quoted Roman at length:
This is not a situation where a failure to testify will cause a penalty to be exacted. See, supra, Lefkowitz, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). Rather, as in a criminal case, the decision to testify or not in the presentation of a defense remains in the unfettered discretion of the Respondent. The decision is a tactical, not a compelled one. A defense to the allegations may be established by alternative methods which do not require the Respondent's testimony. Roman, 94 Misc.2d at 801, 405 N.Y.S.2d at 904.

*1184 [C.L.R., 211 Mont. at 387, 685 P.2d at 929 (1984).]
In another New York case, the appeal was based upon the contention that the respondent's Fifth Amendment right to remain silent was violated when he was required by the trial court, over his objection, to answer questions concerning alleged sexual abuse of his daughters. In the Matter of Gladys "H", 235 A.D.2d 841, 653 N.Y.S.2d 392 (App.Div.1997). During his trial testimony, the respondent refused to admit that he had sexually abused his daughters. The New York Appellate Court held, in part, "It was not improper in these circumstances for Family Court to compel respondent to decide whether to testify and face the possibility that his testimony may be used in a criminal proceeding or to remain silent and face the risk of losing the care and custody of his daughters." Id. at 843, 653 N.Y.S.2d 392 (emphasis added).
Several states have addressed the related issue of the use of statements made to a therapist during the course of an abuse and neglect or guardianship proceeding.
A California court held that, pursuant to a state statute, therapist-patient communications are privileged and cannot be revealed in court. In doing so, the Court emphasized that psychological counseling is vital to the determination of parental fitness. In Re Eduardo, 209 Cal.App.3d 1038, 1042, 261 Cal.Rptr. 68, 70 (Cal.Ct. App.1989). However, the precise scope of the privilege as defined in California is far from clear. The Court distinguished between a court referral to a therapist for counseling and a court ordered psychiatric examination which is primarily an "information-gathering tool, rather than a treatment tool." Id. at 69. The privilege was found not to encompass the latter, "information-gathering examination". Ibid. In addition, in Tarasoff v. Regents of University of California, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976), the court held that a therapist may be required to reveal information gathered during counseling if the patient's statements indicate that he/she is likely to injure seriously a third party.
The State of Minnesota has also addressed this issue. The Minnesota court acknowledged the possibility of a subsequent criminal prosecution based upon disclosures made in therapy. Nevertheless, following the rationale of the New York courts, it held that statements made during evaluations do not violate the Fifth Amendment because there is no compulsion. In Re Welfare of S.A.V., 392 N.W.2d 260, 264 (Minn.Ct.App.1986). The Court reasoned that the State has an interest in protecting children and that the termination proceeding was a result of the parents' unfitness. Ibid. This holding, however, does not permit the Court to compel parents to reveal specific evidence which could prove inculpatory in a separate criminal proceeding. In the Matter of the Welfare of J.W. and A.W., 415 N.W.2d 879 (Minn.1987); See, In re Matter of J.G.W. and J.L.W., 433 N.W.2d 885, 886 (Minn. 1989)("It is a violation of the parent's Fifth Amendment privilege to directly require the parent to admit guilt as a part of a court-ordered treatment plan ... However, the privilege does not protect the parent from the consequences of any failure to succeed in a court-ordered treatment plan.").

III.
The Defendant asserts, that, not unlike the police officers in Garrity, without a stay she will be forced to choose between "the rock and the whirlpool". Garrity, supra, 385 U.S. at 498, 87 S.Ct. at 619, quoting, Stevens v. Marks, 383 U.S. 234, 243, 86 S.Ct. 788, 15 L.Ed.2d 724 (1966). She contends that her choice will be between self-incrimination and her child. She argues that the coercive atmosphere that exists in a termination action is far greater than that faced by the officers in Garrity. The Defendant, however, has overlooked a vital distinction between Garrity and the case at bar: A third party, *1185 the minor-D.J.M., has a substantial interest in this matter. Case law confirms that the focus must be on the rights of the child in guardianship proceedings. The above referenced amendments to Title 30 elucidate the Legislature's intent. The child's interests and an expeditious determination are paramount in this proceeding. ASFA expressly requires a final determination within three months. N.J.S.A. 30:4C-15.2. Additionally, when codifying the public policy behind ASFA, the Legislature amended, N.J.S.A. 30:4C-1 to provide in pertinent part:
This act is to be administered strictly in accordance with the general principles laid down in this section, which are declared to be the public policy of this State, whereby the safety of children shall be of paramount concern:
(a) That the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare, but the health and safety of the child shall be the State's paramount concern when making a decision on whether or not it is in the child's best interest to preserve the family unit.

[N.J.S.A. 30:4C-1(a) (emphasis added)]
The phrase "[T]he health and safety of the child shall be of paramount concern" is used liberally throughout Title 30. It requires Courts to focus upon the interests of the minor. Accordingly, the child must be the primary focus and concern of this Court. Defendant argues that a stay of this proceeding would not harm the minor at issue because he has been with the same foster family for some time. The Court finds this argument unpersuasive for two reasons. First, the longer D.J.M. spends with his foster parents, away from his biological mother, the stronger his ties become to his foster family. This psychological bonding to his foster parents is an issue that must be addressed in the termination proceeding. Second, based upon the facts before the court it is difficult to determine the necessary length of the requested stay. There is no set trial date and even if such a date were known, it would not impact on the exercise of the Defendant's Fifth Amendment privilege. This Court must also consider that any stay would necessarily involve the time required for any criminal appeal. The net effect of this uncertainty as to the time required to prosecute the criminal charge is to leave this child in limbo for months or even years. The Legislature's intent regarding these matters is quite explicit: Prompt disposition of guardianship proceedings is essential to advancing this child's health, stability and permanency. Courts in this state have recognized the importance of permanency. In New Jersey Div. of Youth and Fam. Servs. v. K.M., 136 N.J. 546, 559, 643 A.2d 987 (1994), the Supreme Court held that the Division could bring concurrent abuse and neglect and termination proceedings involving the same family. In doing so, the Court recognized that the Child Placement Bill of Rights Act, N.J.S.A. 9:6B-1 et seq., made permanency a primary concern. The Court reasoned that if "DYFS cannot bring a termination proceeding until an abuse and neglect action finally winds its way through the courts, the Legislature's goal of achieving permanency for the placement of children will be frustrated and the child will suffer. "Id. The Appellate Division similarly stated, "The goal of permanency, not necessarily of reunification, is paramount." In the Matter of the Adoption of a Child by P.S. and J.S., H/W, 315 N.J.Super. 91, 115, 716 A.2d 1171 (1998) (The Court emphasized that the purpose of the Child Placement Bill of Rights Act, N.J.S.A. 9:6B-1 et seq., was to advance each child's need for permanency in a timely manner). The court's reasoning in K.M. is applicable to the case at bar. Every abuse and neglect and guardianship proceeding has the potential to be criminally prosecuted. Accordingly, every such defendant would have the constitutional right to invoke the Fifth Amendment whether or not he/she had been formally *1186 charged with a violation of a criminal statute. The net effect would be a serious disruption in the timely prosecution of abuse and neglect and guardianship cases, thereby preventing permanent placement of a child(ren) for an undeterminable amount of time. According to the Legislature, time is not on the child's side. Indeed, time was the Legislature's primary concern when it amended Title 9 and Title 30.
The court's ruling in this case does not eviscerate D.A.M.'s defense. DYFS still has the burden of proof by clear and convincing evidence. D.A.M. has the right to cross-examine the State's witnesses and present her own defenses. If she so chooses, she may testify and invoke the Fifth Amendment in response to particular inquires. As in a criminal trial, whether or not she testifies is a tactical decision to be made by her.
This Court recognizes that in making this decision, it has been forced to balance the rights of the respective parties. This unfortunately dilutes one right in favor of the other. It is this Court's view that granting use immunity to defendants would be a less restrictive way to resolve the tension that exists in guardianship proceedings. The authority to grant such immunity does not lie with this Court but rather with the Legislature.
Defendant presents compelling Fifth Amendment arguments; however, her rights must yield to the rights of her issue. The minor, D.J.M, has been in foster care for three years. A review of the procedural history reveals the first court hearing was held on September 15, 1998, and this matter has had eight consecutive court hearings. Simply stated, a determination on the merits is long overdue. The individual constitutional rights of the adults and the modus operandi of the criminal justice system must not be utilized to delay a prompt disposition of this guardianship proceeding. To hold otherwise would be to set a disturbing precedent thereby committing a grave injustice to the only indisputably innocent partythe child, D.J.M.
Defendant's motion to stay this proceeding is denied.