IN RE INTEREST OF CLIFFORD M. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. SUZETTE M., APPELLANT.
577 N.W. 2d 547

Filed April 7, 1998.   No. A-97-449.

Stephanie Weber Milone for appellant.

James S. Jansen, Douglas County Attorney, and Karen S. Kassebaum for appellee.

Thomas C. Riley, Douglas County Public Defender, and Ann C. Holtz, guardian ad litem.

MILLER-LERMAN, Chief Judge, and HANNON and IRWIN, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Suzette M., the natural mother of Clifford M., Colette M., and Chelsea M., appeals from an order of the separate juvenile court of Douglas County, Nebraska, terminating her parental rights with respect to the three children. On appeal, Suzette challenges the termination order. Because the court terminated Suzette's parental rights solely on the basis that she refused to waive her right against self-incrimination, we reverse, and remand with directions.

## II. BACKGROUND

On November 10, 1994, the State filed a second amended petition seeking jurisdiction over Clifford, Colette, and Chelsea. The State asserted that Clifford was born on February 17, 1990; that Colette was born on February 1, 1992; and that Chelsea was born on December 28, 1992. The State alleged that on or about February 22, 1994, Suzette's live-in boyfriend had thrown Clifford into a wall, resulting in bruising on the side of Clifford's face. Additionally, the State alleged that all three children had been subjected to sexual contact by both Suzette and

the live-in boyfriend. The State also alleged that Clifford had been subjected to a beating with a belt. The State sought jurisdiction over the children on the basis that Suzette failed to protect them and that she had had sexual contact with them.

After evidentiary hearings, the juvenile court entered an adjudication order. The court found that Suzette admitted the dates of birth of the children. The court found that the allegation that Clifford had been beaten with a belt was not true. The court found that the remaining allegations of the petition were true, including the allegations concerning sexual contact. As such, the court adjudicated the three children to be within the terms of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993). The temporary custody of the children was placed in the Nebraska Department of Social Services for appropriate care and placement.

On March 3, 1995, the juvenile court entered a rehabilitation plan designed to continue the efforts at eventual reunification of this family. Among other requirements, the court ordered Suzette to submit to psychiatric examinations, participate in a YWCA domestic violence program, find appropriate housing, find a legal source of income, and participate in the children's therapy as requested by their therapist. Suzette was granted reasonable rights of visitation, at a minimum of once per week and twice per week if possible. The rehabilitation order was thereafter periodically reviewed and reaffirmed.

The record reveals that Suzette presented evidence at the hearing on the motion to terminate her parental rights, which indicates that she complied with portions of the rehabilitation plan ordered by the juvenile court. Suzette completed psychiatric examinations, enrolled in and completed parenting classes, participated in the YWCA domestic violence program, received income from a legal source, participated in personal counseling, and attended visitation regularly. The record further reveals that the children's therapist desired Suzette to participate in a program known as Parents United as a precursor to participation in family therapy with the children.

Subsequent to a review hearing regarding the rehabilitation plan, on May 3, 1996, the juvenile court entered an order which reaffirmed the prior rehabilitation plan and additionally ordered Suzette to enroll and participate in the Parents United program.

The court specifically held that Suzette's request that the children be returned to her possession was denied "for the reason that the evidence shows that [Suzette] has not addressed the issue of sexual abuse which placed her children into protective custody . . . ."

According to the record, Parents United is a program designed to work specifically with families affected by sexual abuse issues. The program involves therapy both for victims of sexual abuse and for offenders of sexual abuse. As the program is operated in the Nebraska area, a person may be admitted into the program either as a nonoffender who has been affected by sexual abuse or as an offender who has committed sexual abuse. If a person is to be admitted into the program as an offender, Parents United requires that the offender first admit responsibility for the sexual abuse which he or she perpetrated on the victim.

The record indicates that Suzette contacted the director of Parents United in May or June 1996 about participating, after being requested to do so by the children's therapist and after being ordered to do so by the juvenile court order of May 3, 1996. Suzette refused to make statements acknowledging responsibility for the alleged sexual abuse perpetrated upon Clifford, Colette, and Chelsea. As a result, Suzette was denied admission into the program. The director of Parents United authored a letter to the juvenile court in June, which now appears in the bill of exceptions, explaining that Suzette could not be admitted into the program as a nonoffender because of the court's prior adjudication order finding that she was responsible for the sexual contact and that Suzette could not be admitted into the program as an offender without an acknowledgment by her of responsibility for the sexual contact.

On December 5, 1996, the court-appointed guardian ad litem for the children filed a motion to terminate Suzette's parental rights. The guardian ad litem generally alleged in the motion that termination was appropriate under Neb. Rev. Stat. § 43-292(2) and (7) (Reissue 1993). Section 43-292(2) provides that parental rights may be terminated when "[t]he parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protec-

tion." Section 43-292(7) provides that parental rights may be terminated when a "juvenile has been in an out-of-home placement for eighteen or more consecutive months and the parents have failed to correct the conditions leading to the juvenile's out-of-home placement in spite of reasonable efforts and services" offered to the parents by the Department of Social Services or court order.

The guardian ad litem asserted that termination of Suzette's parental rights was appropriate under § 43-292(2), alleging as follows:

[The children] come within the meaning of §43-292 (2) ... because the natural parent, Suzette M[.] has substantially and continuously neglected [the children] and refused to give the necessary parental care and protection, to wit:

A. After a February 2, 1995, finding by [the juvenile court] that said children have been subjected to sexual contact by Suzette M[.] and [her live-in boyfriend]. Suzette M[.] refuses to acknowledge said sexual contact occurred. Suzette M[.] refuses to acknowledge any parental responsibility that she has toward said children's care and protection to that end.

The guardian ad litem asserted that termination of Suzette's parental rights was appropriate under § 43-292(7), alleging as follows:

[The children] come within the meaning of §43-292 (7) ... being under the age of 18 years and having been in an out-of-home placement for 18 or more consecutive months and Suzette M[.] has failed to correct the conditions leading to the juvenile's out-of-home placement in spite of reasonable efforts and services to the parent ordered by the Court or offered by the Nebraska Department of Social Services.

A. Since March, 1994, said children have been in the Nebraska Department of Social Services for out-of-home placement.

B. Since March, 1994, Suzette M[.] has gained no insight regarding her children's care and protection with respect to having been subjected to sexual contact by herself and [her live-in boyfriend].

C. Due to Suzette M[.'s] denial of the sexual contact to which she and [her live-in boyfriend] subjected said children, she has effectively barred her participation in the children's therapy as ordered by [the juvenile court].

Although no motion is contained in the record in which Suzette sought a modification of the rehabilitation plan to resolve the difficulties presented by the juvenile court's requirement that she participate in Parents United, it appears that such a motion was made. In a December 12, 1996, order reviewing the rehabilitation plan, the court noted that Suzette's attorney "requested that participation in Parents United b[e] stricken for the reason that [Suzette] is not a candidate for the program" pursuant to the letter to the court, which was authored by the director of the program and is referenced above. The court denied Suzette's request to modify the rehabilitation plan in this manner and kept the requirement that Suzette participate in Parents United. The previous order was to remain "in full force and effect."

On March 27, 1997, the juvenile court entered an order terminating Suzette's parental rights. The court specifically found that termination was appropriate under § 43-292(2) and (7). The court specifically set forth as the basis for termination a verbatim recitation of the allegations of the motion to terminate, as set forth above. The court found that there was clear and convincing evidence to support termination and that termination was in the best interests of the children. The court ordered that temporary custody of the children remain in the Department of Social Services and that the children be placed in the adoption unit for adoptive planning and placement. Suzette filed this appeal from the termination order.

### III. ASSIGNMENTS OF ERROR

On appeal, Suzette has assigned four errors. Our analysis requires us to review only two of these errors, however, and we will not further iterate the remaining two. First, Suzette asserts that the juvenile court erred in using her refusal to acknowledge sexual contact with her children as a basis for termination of her parental rights, as such action violated her right against self-incrimination. Second, Suzette asserts that the court's findings

under § 43-292(2) and (7) are not supported by clear and convincing evidence.

## IV. STANDARD OF REVIEW

In an appeal from a judgment terminating parental rights, an appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court, but when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994); *In re Interest of Tabitha J.*, 5 Neb. App. 609, 561 N.W.2d 252 (1997). Regarding matters of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *Smith v. Smith*, 246 Neb. 193, 517 N.W.2d 394 (1994); *In re Interest of Tabitha J., supra.*

## V. ANALYSIS

### 1. SELF-INCRIMINATION

#### (a) Self-Incrimination Generally

##### *(i) Sources of Right*

In Nebraska, a person's right against self-incrimination emanates from three distinct sources, the U.S. Constitution, the Nebraska Constitution, and the Nebraska statutes. In the U.S. Constitution, the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." This provision of the 5th Amendment applies to the states through the 14th Amendment. *Allen v. Illinois*, 478 U.S. 364, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986). The Fifth Amendment privilege not only permits a person to refuse to testify against himself or herself during a criminal trial in which he or she is a defendant, but also privileges him or her to refuse to answer questions put to him or her in any other proceeding, civil or criminal, formal or informal, where the answers might tend to incriminate him or her in future criminal proceedings. *Allen v. Illinois, supra.*

In Nebraska, the protections of the Fifth Amendment are further supported by the provisions of the Nebraska Constitution,

as well as by a statutory safeguard. The Nebraska Constitution specifically provides that "[n]o person shall be compelled, in any criminal case, to give evidence against himself . . . ." Neb. Const. art. I, § 12. Additionally, statutory protection is provided by Neb. Rev. Stat. § 25-1210 (Reissue 1995), which provides that a witness is not compelled to answer "[w]hen the matter sought to be elicited would tend to render the witness criminally liable . . . ."

### (ii) Application to Termination Proceedings

Our research has indicated that the question of the applicability of the right against self-incrimination to proceedings for termination of parental rights has not been significantly litigated in this state. Nonetheless, the Nebraska Supreme Court has indicated, in at least one prior case, that the protections afforded against self-incrimination, in the proper context, are applicable in termination of parental rights proceedings. See *In re Interest of M.S.*, 218 Neb. 889, 360 N.W.2d 478 (1984). In *In re Interest of M.S.*, the court recognized that a proceeding to terminate parental rights is statutorily mandated and is brought about to protect a child, rather than being criminal in nature. The court concluded that absent questions which would subject the parent to criminal sanctions, a termination proceeding does not trigger the self-incrimination protections. Nonetheless, it is apparent from the court's holding that if a parent is subjected to questions the response to which would potentially subject the parent to criminal penalties, the protections against self-incrimination do apply.

### (iii) Self-Incrimination in Present Case

Initially, we believe it is important to assess and characterize the actions of the juvenile court with respect to Suzette and the Parents United program. Our review of the record indicates that the juvenile court required Suzette to participate in Parents United in two manners. First, the court initially ordered Suzette to participate in the children's therapy "as requested by the children's therapist." The children's therapist requested Suzette to participate in Parents United as a precursor to any family therapy involving Suzette and the children. Second, in the May 3, 1996, order reviewing the existing rehabilitation plan, the court

specifically ordered Suzette to enroll and participate in Parents United. The court ordered this again on December 12.

The record indicates that Parents United would not accept Suzette as a participant in the program unless and until Suzette acknowledged that she was a sexual abuse offender with respect to her children. In June 1996, the court became aware of this specific requirement by way of a letter from the director of Parents United to the juvenile court. In the December 12 order reviewing the rehabilitation plan, the court noted that Suzette's attorney sought to have participation in Parents United stricken from the rehabilitation plan because Suzette would not incriminate herself by admitting to sexual contact with the children and therefore was not a proper candidate for the program pursuant to the letter to the court from the Parents United program. Nonetheless, the court denied Suzette's request to modify the rehabilitation plan in this manner and kept the requirement that she participate in Parents United. The previous order was to remain "in full force and effect."

Because of Suzette's refusal to acknowledge that she sexually abused her children, she was denied admission in the Parents United program. Specifically, because of this same refusal to acknowledge her role in the sexual abuse of the children and Parents United denying her permission to participate in the program, the guardian ad litem sought termination of Suzette's parental rights.

A review of the motion for termination of parental rights indicates that both of the counts contained in the motion upon which termination was sought are framed entirely around Suzette's refusal to acknowledge that she had sexually abused the children. The guardian ad litem asserted in the motion that Suzette's parental rights should be terminated pursuant to § 43-292(2) and alleged as follows:

> [The children] come within the meaning of §43-292 (2) . . . because the natural parent, Suzette M[.] has substantially and continuously neglected [the children] and refused to give the necessary parental care and protection, to wit:
>
> A. After a February 2, 1995, finding by [the juvenile court] that said children have been subjected to sexual

contact by Suzette M[.] and [her live-in boyfriend]. Suzette M[.] refuses to acknowledge said sexual contact occurred. Suzette M[.] refuses to acknowledge any parental responsibility that she has toward said children's care and protection to that end.

The guardian ad litem further asserted in the motion that Suzette's parental rights should be terminated pursuant to § 43-292(7) and alleged as follows:

[The children] come within the meaning of §43-292 (7) . . . being under the age of 18 years and having been in an out-of-home placement for 18 or more consecutive months and Suzette M[.] has failed to correct the conditions leading to the juvenile's out-of-home placement in spite of reasonable efforts and services to the parent ordered by the Court or offered by the Nebraska Department of Social Services.

A. Since March, 1994, said children have been in the Nebraska Department of Social Services for out-of-home placement.

B. Since March, 1994, Suzette M[.] has gained no insight regarding her children's care and protection with respect to having been subjected to sexual contact by herself and [her live-in boyfriend].

C. Due to Suzette M[.]'s denial of the sexual contact to which she and [her live-in boyfriend] subjected said children, she has effectively barred her participation in the children's therapy as ordered by [the juvenile court].

We read sections A, B, and C of the guardian ad litem's allegations concerning § 43-292(7) to be conjunctive allegations. The record does not indicate any services offered by the Department of Social Services or by the juvenile court to assist Suzette in gaining insight or fostering her "participation in the children's therapy," except the Parents United program. Similarly, there was no evidence presented regarding these allegations, except that Suzette did not participate in Parents United, and the evidence thus supports a conjunctive reading of the allegations.

The juvenile court's order terminating Suzette's parental rights is also based entirely on her refusal to acknowledge that

she committed alleged criminal acts upon her children. In the termination order, the court made findings which amount to a verbatim recitation of the motion's allegations. The court held that Suzette's parental rights should be terminated pursuant to § 43-292(2) and found as follows:

[The children] come within the meaning of Section 43-292(2) . . . because the natural parent, Suzette M[.], has substantially and continuously neglected [the children] and refused to give the necessary parental care and protection, to wit:

A. After a February 2, 1995, finding by [the juvenile court] that said children have been subjected to sexual contact by Suzette M[.] and [her live-in boyfriend], Suzette M[.] refuses to acknowledge said sexual contact occurred. Suzette M. refuses to acknowledge any parental responsibility that she has toward said children's care and protection to that end.

The court's order further held that Suzette's parental rights should be terminated pursuant to § 43-292(7) and found as follows:

[The children] come within the meaning of Section 43-292(7) . . . being under the age of eighteen years and having been in an out-of-home placement for 18 or more consecutive months and Suzette M[.] has failed to correct the conditions leading to the juveniles' out-of-home placement in spite of reasonable efforts and services to the parent ordered by the Court or offered by the Nebraska Department of Social Services.

A. Since March, 1994, said children have been in the Nebraska Department of Social Services for out-of-home placement.

B. Since March, 1994, Suzette M[.] has gained no insight regarding her children's care and protection with respect to having been subjected to sexual contact by herself and [her live-in boyfriend].

C. Due to Suzette M[.]'s denial of the sexual contact to which she and [her live-in boyfriend] subjected said children, she has effectively barred her participation in the children's therapy as ordered by [the juvenile court].

As such, the limited question we are presented with on appeal is whether the juvenile court may terminate Suzette's parental rights solely because she refused to publicly acknowledge to a Parents United counselor that she had had sexual contact with her children. We are only concerned here with whether a person's parental rights may be terminated solely because the parent refuses to waive his or her right against self-incrimination.

On appeal, Suzette accurately characterizes the dilemma with which the juvenile court presented her: either acknowledge that she sexually abused her children so that she can become enrolled in Parents United, while at the same time potentially incriminating herself for sexual abuse of her children, or refuse to incriminate herself and have her parental rights terminated because she exercised her right not to incriminate herself. Our review of the court's rehabilitation orders, coupled with the court's knowledge that Suzette's acknowledgment of sexual contact with the children was a prerequisite to satisfying the rehabilitation plan, and review of the motion to terminate Suzette's parental rights and the court's order terminating her parental rights, leads us to conclude that the court presented Suzette with precisely that dilemma.

### (b) Self-Incrimination in Other Jurisdictions

Our research has revealed no case in Nebraska which specifically addresses the issue of whether a person's parental rights may be terminated solely for refusing to waive the fundamental right against self-incrimination. Other states have, however, addressed the issue. A review of the authority in other states indicates that there is a very fine, although very important, distinction between terminating parental rights based specifically upon a refusal to waive protections against self-incrimination and terminating parental rights based upon a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, perhaps in part because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy. The latter is constitutionally permissible; the former is not. See, *Mullin v. Phelps*, 647 A.2d 714 (Vt. 1994); *Matter of Welfare of J.G.W.*, 433 N.W.2d 885 (Minn. 1989); *Matter of Welfare of J.W.*, 415 N.W.2d 879 (Minn. 1987). As such, we do not disagree with the

dissent's assertion that termination of parental rights may be based, in an appropriately pled and proven case, on a parent's failure to undergo meaningful therapy. The record in the present case indicates, however, that termination of Suzette's parental rights was pled and obtained solely on the basis of her refusal to incriminate herself by acknowledging to a Parents United counselor that she had had prior sexual contact with her children.

### (i) Supporting Case Law

A strikingly similar situation was presented before the Supreme Court of Minnesota in *Matter of Welfare of J.W., supra.* In *Matter of Welfare of J.W.*, the district court adjudicated J.W. and A.W. to be dependent and neglected children and entered a disposition order requiring, inter alia, that the parents undergo psychological evaluations, which would include an explanation of the death of J.W. and A.W.'s cousin, who had been under the parents' care, consistent with medical findings that the cousin had died because of a fatal abdominal blow caused by someone with the strength of an adult. The court's adjudication order included a finding that the parents were responsible for the death of the cousin. At the disposition hearing, the county attorney informed the court and the parents that if the parents did not intend to comply with this provision of the disposition order, then he would seek to have their parental rights terminated. The parents asserted their privilege against self-incrimination and alleged that the disposition order provision in question violated that privilege because it required them to choose between incriminating themselves or losing their children.

The Minnesota Supreme Court in *Matter of Welfare of J.W.* held that termination of the parents' parental rights as a result of their invocation of the privilege against self-incrimination was impermissible. The court noted that the critical issue was how far the mantle of the protection afforded by the privilege against self-incrimination extends. The court ultimately held that a trial court may not directly require parents to incriminate themselves as part of a dispositional order, and a trial court may not compel therapy which would require the parents to incriminate themselves. *Id.* However, the court held that a trial court may compel the parents to undergo "effective" treatment and recog-

nized that it may be difficult for the parents to demonstrate that any treatment has been effective if it does not involve fully disclosing their prior actions. *Id.* The court also noted that the privilege did not prevent the trial court from considering at disposition the evidence that the parents had previously been found responsible for the cousin's death and that the parents would have to attempt to overcome that evidence in conjunction with demonstrating that they had undergone meaningful therapy. In this context, if the court concludes that the therapy undergone by the parents has been ineffectual in resolving the underlying cause of the adjudication, termination of the parents' parental rights will not be a consequence of having invoked the Fifth Amendment, but, rather, will simply be a consequence of the reality that it is unsafe for children to be with abusive and violent parents who have not undergone meaningful and effectual therapy. *Id.*

The Minnesota Supreme Court revisited the issues of *Matter of Welfare of J.W.*, 415 N.W.2d 879 (Minn. 1987), in *Matter of Welfare of J.G.W.*, 433 N.W.2d 885 (Minn. 1989). The court iterated the basic holdings of the prior case, concluding first, that a trial court's order, to the extent it directly requires a party to incriminate himself or herself in order to avoid having parental rights terminated, violates the privilege against self-incrimination and, second, that the privilege does not protect a parent from the consequences of any failure to succeed in a court-ordered treatment plan. *Id.*

The reasoning of the Minnesota court was recently followed by the Vermont Supreme Court. See *Mullin v. Phelps*, 647 A.2d 714 (Vt. 1994). In *Mullin v. Phelps*, the Vermont Supreme Court confronted a similar issue in the context of a motion for modification of custody provided in a divorce decree. In *Mullin v. Phelps*, the husband had been awarded custody of the parties' two minor children after divorce proceedings. The wife sought modification and, during the modification hearing, presented evidence of alleged sexual abuse perpetrated by the husband on the children. The trial court found by a preponderance of the evidence that the husband had sexually abused the children, transferred custody to the wife, and ordered that the husband was to have no further contact with the children unless and until

he acknowledged sexually abusing them. On appeal, the Vermont Supreme Court, citing *Matter of Welfare of J.W., supra*, held that specifically conditioning any future contact between the husband and the children on his acknowledgment of sexually abusing them violated his privilege against self-incrimination. *Mullin v. Phelps, supra*. The Vermont court also noted, however, that parental rights could be terminated based on the fact that the husband's denial of the problem prevented effective therapy. *Id.*

### (ii) Distinguishable Case Law

The dissent relies upon the holding of the Minnesota Court of Appeals in *Matter of Welfare of S.A.V.*, 392 N.W.2d 260 (Minn. App. 1986), though it was decided prior to the decisions of the Minnesota Supreme Court in *Matter of Welfare of J.W., supra*, and *Matter of Welfare of J.G.W., supra*. In *Matter of Welfare of J.W.*, the Minnesota Supreme Court specifically noted that the issue before the Minnesota Court of Appeals in *Matter of Welfare of S.A.V.* was the fact that the parents' claims regarding self-incrimination were premature because the parents had not been threatened with any sanctions for refusing to waive the privilege. As such, any language in *Matter of Welfare of S.A.V.* concerning the probable outcome at termination was merely dictum. See *Matter of Welfare of J.W., supra*. We find the precise holding of the Minnesota Supreme Court on this issue more persuasive than the dictum of the Minnesota Court of Appeals.

In *In Interest of H.R.K.*, 433 N.W.2d 46 (Iowa App. 1988), the Iowa Court of Appeals followed the dictum of *Matter of Welfare of S.A.V., supra*. The Iowa decision is, however, further distinguishable from the present case. It is clear from the opinion in *In Interest of H.R.K.* that the Iowa statutory scheme for termination of parental rights is not entirely consistent with our statutes on the matter. Additionally, a review of the court's decision in *In Interest of H.R.K.* reveals that the parents' failure to complete a sexual abuse program requiring them to first acknowledge sexually abusing their children was only part of the basis for terminating their parental rights. As such, the presence of other grounds for termination could have provided the

Iowa court with independent reasons for affirming the termination. As noted above, in the case before us, the refusal to waive the privilege against self-incrimination was the sole ground upon which Suzette's rights were terminated.

Finally, the dissent relies upon *Matter of Tammy B.*, 185 A.D.2d 881, 587 N.Y.S.2d 377 (1992), in which a New York appellate court affirmed the termination of a father's parental rights based on permanent neglect. A review of the decision in *Matter of Tammy B.*, however, reveals no indication that the father ever asserted that his privilege against self-incrimination was being violated or that the appellate court was in any way presented with the issue. No mention of the issue appears in the opinion. As such, we find the case to be inapposite concerning the issue of whether or not parents may be forced to waive the privilege against self-incrimination or risk losing their children.

### (iii) Nebraska Cases

We also recognize that in at least two prior cases of the appellate courts of this state, termination of parental rights based in part on a parent's failure to acknowledge sexually abusing the interested children has been affirmed. See, *In re Interest of N.W. and R.W.*, 238 Neb. 620, 472 N.W.2d 887 (1991); *In re Interest of Robert D. et al.*, 94 NCA No. 26, case No. A-93-382 (not designated for permanent publication). However, each of those cases is distinguishable from the present case, and neither provides us any guidance in the present case. In neither of those cases did the parent assert any privilege against self-incrimination. Additionally, in *In re Interest of N.W. and R.W.*, the parent who refused to acknowledge the sexual abuse had already pleaded guilty to criminal charges for the sexual assault and in *In re Interest of Robert D. et al.*, the parents had entered into a written stipulation agreeing to have the court order therapy and agreeing to acknowledge their respective roles in the sexual abuse.

### (c) Application of Law to Present Case

#### (i) Termination

We find the reasoning of the Minnesota and Vermont courts to be persuasive. It is apparent that the situation in the

present case is materially no different than the situation in those cases where the trial court specifically ordered the parties to make incriminating statements. In the present case, the juvenile court ordered Suzette to enroll in a program which the court was aware required her to make incriminating statements as a prerequisite to enrollment. The dilemma the court presented Suzette with in the present case is best characterized by a question asked by the deputy county attorney during questioning of Suzette at the termination hearing. The deputy county attorney asked Suzette, "[A]re you choosing your right against self-incrimination over your children?" Interestingly, although the court sustained objections to the question, the ultimate actions of the court forced Suzette, in essence, to make that choice between her right against self-incrimination and her children. According to the court's order terminating Suzette's parental rights, her parental rights were terminated solely because she refused to make the incriminating statements necessary to enroll in Parents United as a precursor to further participation in family therapy. Such an action is contrary to the Constitutions of the United States and Nebraska.

As noted above, the record in the present case indicates that the juvenile court found at adjudication that Suzette had sexually abused her children, that given that adjudication Suzette could not enroll in Parents United without making potentially incriminating statements, and that the court was aware that Suzette would be required to make the statements but, nonetheless, ordered her to enroll in and complete the program. Additionally, the record fails to indicate that Suzette has been prosecuted or entered any criminal pleas or stipulations regarding the alleged sexual conduct, either of which would make her situation analogous to prior Nebraska case law. See, *In re Interest of N.W. and R.W., supra*; *In re Interest of Robert D. et al., supra*.

### (ii) Notice

We note that implicit in the dissent is the conclusion that the juvenile court in this case did, in fact, terminate Suzette's parental rights on an improper basis, i.e., the failure to waive her right against self-incrimination. However, the dissent sets

out the testimony presented which, according to the dissent, would allow us to make a de novo finding that Suzette failed to achieve meaningful rehabilitation, which in turn, according to the dissent, would allow us to conclude that Suzette's parental rights were properly terminated because she failed to comply with the rehabilitation plan and failed to remedy the circumstances for which the children were removed from her home. We cannot accept this as an appropriate means of upholding the court's actions in the present case, even were we to agree that the evidence supported such a finding, which we do not.

As noted previously, a review of the motion for termination of Suzette's parental rights indicates that the sole basis for which termination was sought, under either of the two statutory sections pled in the motion, was that she had failed to acknowledge sexually abusing the children. The guardian ad litem did not plead as a basis for termination that Suzette had failed to comply with the rehabilitation plan or that she had failed to make appropriate therapeutic progress. As such, the motion put Suzette on notice only that she was being accused of failing to waive her privilege against self-incrimination. The dissent acknowledges this when it concedes that "at first blush, it might appear that the guardian ad litem sought termination solely on the basis that Suzette refused to acknowledge that sexual contact had occurred."

The system embodied in Nebraska's pleading system has many purposes and functions, not the least of which is to provide adequate notice as to what allegations a party will be required to meet at trial. See *In re Interest of Kelly D.*, 3 Neb. App. 251, 526 N.W.2d 439 (1994). A review of the motion in this case indicates that Suzette was in no way given notice that she would have to answer any allegation other than that her parental rights were being terminated because of her invocation of the privilege against self-incrimination. Had she been notified otherwise, she could have prepared evidence to rebut any testimony presented by the State which suggested that she could not get effective therapy without first admitting to having committed the abuse.

As it is, the evidence in the record is not conclusive on whether or not meaningful therapy is possible without Suzette's

first acknowledging that she has abused her children, an issue which appears to play a vital role in the reasoning of the dissent. The State's witnesses testified, in essence, that it is "difficult" or "almost impossible" to make progress in therapy without such an admission. Suzette's own therapist testified that it was possible for Suzette to begin therapy prior to admitting involvement in the abuse. Despite our de novo review, the fact remains that the pleadings in this case failed to put Suzette on notice that she would be called to answer any charges about the adequacy of available therapy or her ability to receive meaningful therapy without first admitting that she had abused her children. As such, contrary to the assertions of the dissent, we cannot find that termination of Suzette's parental rights was appropriate for reasons not pled or for any reason beyond that which the juvenile court was called upon to decide the case. Our review is, therefore, limited to whether Suzette's parental rights were properly terminated based upon her refusal to waive the privilege against self-incrimination.

### (iii) Collateral Attack

■ We also recognize that the Nebraska Supreme Court has said that a parent may not generally raise a collateral attack challenging the provisions of a rehabilitation plan if the parent failed to timely appeal from the plan. See *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993). The present case is distinguishable from *In re Interest of J.H.*, however, and we do not perceive Suzette's appeal as constituting an impermissible collateral attack on the rehabilitation plan. Unlike the parent in *In re Interest of J.H.*, Suzette does not generally challenge whether the plan contained reasonable and material rehabilitative provisions. Rather, as noted above, Suzette challenges specifically the juvenile court's termination of her parental rights in violation of her privilege against self-incrimination.

The claim in the present case is not an impermissible collateral attack because Suzette's claim in this appeal could not have been properly asserted in an appeal directly from the rehabilitation plan. When the plan was entered, she had not been immediately threatened with any judicial sanction as a result of the plan provision ordering her to counseling at Parents United and,

thereby, incriminating herself. In fact, had she chosen to waive her privilege against self-incrimination and proceeded to counseling with Parents United, she would have no basis to object to this provision. Therefore, until she invoked her right to be free from self-incrimination, any appeal regarding this provision of the plan would have been premature and futile. See *Matter of Welfare of S.A.V.*, 392 N.W.2d 260 (Minn. App. 1986).

Had Suzette appealed directly from the rehabilitation plan, she would not have been entitled to relief. See *id*. When the juvenile court took action against Suzette to terminate her parental rights specifically because she had invoked her privilege against self-incrimination, Suzette was entitled to assert the privilege and file a timely appeal from the actions of the court resulting from her invocation of the privilege. This was the earliest time at which Suzette could properly have sought review of the court's actions, unlike the situation in *In re Interest of J.H.*, where the parent merely challenged the reasonableness of the terms of the rehabilitation plan, a right which the parent had immediately available upon imposition of the plan. On these facts, Suzette's challenge does not constitute an impermissible collateral attack.

### (d) Resolution

We conclude that because the juvenile court terminated Suzette's parental rights solely because she refused to waive her right to be free from self-incrimination, which is an impermissible basis for termination under constitutional and statutory law in Nebraska, the court's termination order must be reversed. We do not conclude that the order can, on the facts of the present case, be supported on any independent basis despite our de novo review. Finally, we conclude that Suzette's challenge does not present an impermissible collateral attack. Therefore, the order terminating Suzette's parental rights must be reversed.

In reversing the termination order in this case, we do not hold that juvenile courts may not or should not order parents to enroll in therapy programs, such as Parents United. Such programs may be effective and may be essential to a particular parent's rehabilitation, and if the privilege against self-incrimination is brought into play, a parent may choose to waive that privilege in

favor of rehabilitation. Such a decision, whether to waive a constitutional privilege, is for the parent to make, not for the court to compel. The limited holding of this opinion is that courts may not *terminate* parental rights on the sole basis that a parent *refuses* to waive his or her right against self-incrimination.

## 2. CLEAR AND CONVINCING EVIDENCE

Suzette's second assigned error is that the order terminating her parental rights is not supported by clear and convincing evidence. As noted above, the juvenile court's order terminating Suzette's parental rights was based entirely on her failure to acknowledge sexual contact with her children. The Constitutions of the United States and Nebraska dictate that the court cannot condition her parental rights upon such acknowledgment. Additionally, as noted above, because of the nature of the pleadings in this case, the notice given Suzette, and the evidence presented, we are unable to find that termination could properly be supported on any basis beyond that pled in the motion for termination. As such, there was not sufficient evidence to support the termination order in this case.

It is obvious that, as the dissent asserts, no responsible public official will return children to an environment where they may be subjected to sexual contact by an adult. That is not, however, what this opinion suggests should happen, nor is it what will happen in the present case. As a result of our decision, the termination order is reversed, and the matter is remanded with directions. The children will remain in the custody of the State until further order of the juvenile court, a rehabilitation plan will remain in effect, and the juvenile court judge will continue to enter appropriate orders guaranteeing the safety, health, and welfare of these children. The State is not prejudiced from filing another motion to terminate Suzette's parental rights on lawful grounds and presenting evidence to support such motion, if and when such action becomes appropriate.

It may also be true, as the dissent suggests, that the chances of reunification are marginal without meaningful therapy and treatment. These observations, however, do not address the issue presented to this court. The only issue properly before us is whether a juvenile court may terminate a parent's rights

solely on the basis that the parent will not incriminate himself or herself after being ordered by the court to do so. Because we conclude that a court may not do so, we similarly conclude that there was not clear and convincing evidence presented to support termination on a proper basis in the present case. The potential for termination of Suzette's parental rights based upon other constitutionally permissible grounds is not raised by the facts of the case before us, and such other grounds do not properly constitute independent bases for termination of Suzette's parental rights at this time, as the dissent argues.

## VI. CONCLUSION

Because the juvenile court improperly terminated Suzette's parental rights solely for refusing to waive her right to be free from self-incrimination, we reverse, and remand to the court to enter an order denying the guardian ad litem's motion to terminate Suzette's parental rights.

REVERSED AND REMANDED WITH DIRECTIONS.

HANNON, Judge, dissenting.

I respectfully dissent. Primarily, I do not agree with the majority's conclusion that the termination of Suzette's parental rights was pled and obtained solely on the basis of her refusal to incriminate herself. I also do not agree with that portion of the majority's opinion which essentially holds that Suzette is not collaterally attacking the dispositional order requiring her to participate in Parents United. I apologize for the length of the analysis, but it is necessary to demonstrate my position.

*Sufficiency of Pleadings.*

The majority opinion glosses over the fact that one of the alleged grounds for termination was Neb. Rev. Stat. § 43-292(7) (Reissue 1993), that is, that parental rights may be terminated when

> [t]he juvenile has been in an out-of-home placement for eighteen or more consecutive months and the parents have failed to correct the conditions leading to the juvenile's out-of-home placement in spite of reasonable efforts and services to the parents ordered by the court or offered by the Department of Social Services or other designated agency.

For completeness, we set forth the allegations in the guardian ad litem's petition as they apply to subsection (7). The guardian ad litem alleged that

> Suzette [M.] has failed to correct the conditions leading to the juvenile's [sic] out-of-home placement in spite of reasonable efforts and services to the parent ordered by the Court or offered by the Nebraska Department of Social Services.
>
> A. Since March, 1994, said children have been in the Nebraska Department of Social Services for out-of-home placement.
>
> B. Since March, 1994, Suzette M[.] has gained no insight regarding her children's care and protection with respect to having been subjected to sexual contact by herself and [her live-in boyfriend].
>
> C. Due to Suzette [M.'s] denial of the sexual contact to which she and [her live-in boyfriend] subjected said children, she has effectively barred her participation in the children's therapy as ordered by [the juvenile court].

I believe these allegations are sufficient to raise issues under § 43-292(7). They do not, as the majority opinion repeatedly suggests, "put Suzette on notice only that she was being accused of failing to waive her privilege against self-incrimination." Rather, they put her on notice that her children had been in out-of-home placement for 18 or more consecutive months and that she had failed to correct the conditions leading to the children's out-of-home placement. As discussed below, relevant authority holds that parental rights may be terminated based on the parents' refusal to acknowledge sexual or other abuse of their children as part of effective therapy without violating the Fifth Amendment. Such is the case here.

Concerning § 43-292(2), the allegations in the guardian ad litem's petition are organized in such a fashion that, at first blush, it might appear that the guardian ad litem sought termination solely on the basis that Suzette refused to acknowledge that sexual contact had occurred. The guardian ad litem alleged that Suzette had "substantially and continuously neglected" the children and had "refused to give the necessary parental care and protection." Subsection (2) in support thereof alleges that

after a finding by the juvenile court that the children had been subjected to sexual contact by Suzette and her live-in boyfriend, Suzette had refused to acknowledge that the sexual contact had occurred and that she had refused to "acknowledge any parental responsibility that she has toward said child[ren]'s care and protection to that end."

Section 43-292(2) and (7) does not, however, contain the psychological conclusions which the evidence shows, namely, that without admitting to the sexual contact, Suzette's therapy cannot be successful, and that without successful therapy, Suzette cannot be given custody of the children. Given the fact that in this day and age, judges, prosecutors, guardians ad litem, attorneys, and the public generally know that sexual abusers do not change without therapy, and that admission of the past harmful conduct is a necessary prerequisite to successful therapy, I would hold the petition to be adequate under § 43-292(2). In fact, the allegation that she substantially and continuously neglected them and refused to give them the necessary parental care is in itself sufficient. At least, I am satisfied that Suzette and her attorney knew and understood the basis of the guardian ad litem's allegation.

*Law and Evidence Under § 43-292(7).*

Section 43-292(7) focuses on a parent's failure to remedy the circumstances for which the child was removed from the parent's custody. Suzette is essentially challenging the legality of the underlying orders, which (1) found that she had sexually abused her children and (2) required that she participate in Parents United. In Nebraska, both adjudication and dispositional orders are final, appealable orders. See, *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997); *In re Interest of Andrew H. et al.*, 5 Neb. App. 716, 564 N.W.2d 611 (1997). The majority overlooks the well-settled proposition of juvenile law that collateral attacks on previous proceedings are impermissible unless the attack is grounded upon the court's lack of jurisdiction over the parties or subject matter. *In re Interest of Joshua M. et al., supra*; *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993); *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992). In *In re Interest of*

*Joshua M. et al., supra,* the mother attempted to collaterally attack, on an appeal from a termination of her parental rights, a rehabilitation plan which had been part of a previous dispositional order. The court concluded that she could not collaterally attack the rehabilitation plan adopted in that order because it was a final, appealable order and that she had failed to appeal it. As stated by the court,

> A parent's unwillingness to comply with a rehabilitation program directed at reuniting the parent with his or her child and designed to secure the continued long-term health and well-being of the child compels the conclusion that termination of that parent's rights is in the best interests of the child.

251 Neb. at 637, 558 N.W.2d at 564.

The foregoing authority convinces me that the orders Suzette is attempting to challenge cannot be collaterally attacked. Suzette had her opportunity to appeal the orders but chose not to do so. As a result, Suzette's present appeal cannot question the validity of the dispositional order requiring her to participate in therapy and, more specifically, Parents United. There can be no question but that the therapy was a reasonable effort and service to Suzette ordered by the juvenile court. It may be that the rehabilitation order requiring Suzette to admit her sexual contact was in error, but it was not appealed from. Therefore, that order was final and effective.

The majority adopts the reasoning of the Minnesota and Vermont courts. I note, however, that none of the three cases cited was an appeal from a termination of parental rights.

In *Matter of Welfare of J.W.*, 415 N.W.2d 879 (Minn. 1987), the parents appealed from the trial court's rehabilitation treatment plan, which followed a finding that they were responsible for the death of their 2-year-old nephew. The plan required the parents to obtain psychological evaluations and to explain the death of the 2-year-old consistent with the medical findings.

In finding that the order requiring the parents to incriminate themselves was violative of the Fifth Amendment, the *Matter of Welfare of J.W.* court stated:

> While the state may not compel therapy treatment that would require appellants to incriminate themselves, it may

require the parents to otherwise undergo treatment. *Therapy, however, which does not include incriminating disclosures, may be ineffective; and ineffective therapy may hurt the parents' chances of regaining their children. These consequences lie outside the protective ambit of the Fifth Amendment.*

(Emphasis supplied.) *Id.* at 883.

Moreover, in a discussion of future decisions regarding the placement of the children, the court stated:

All we can say is that it remains to be seen whether a less than candid therapy will suffice to make appellants good parents. Admittedly, the parents are confronted with a dilemma, but *it is not a dilemma that triggers the Fifth Amendment to the extent the parents would wish. In the lexicon of the Fifth Amendment, the risk of losing the children for failure to undergo meaningful therapy is neither a "threat" nor a "penalty" imposed by the state. It is simply a consequence of the reality that it is unsafe for children to be with parents who are abusive and violent.*

(Emphasis supplied.) *Id.* at 884.

In my opinion, if Suzette had appealed from the rehabilitation plan, *Matter of Welfare of J.W.* might have been used as authority for finding that the plan violated her privilege against self-incrimination because it required her to admit to criminal conduct. However, Suzette did not appeal from that dispositional order. She is still not required to admit to the conduct; she is simply suffering the consequences in the termination proceedings.

In *Matter of Welfare of J.G.W.*, 433 N.W.2d 885 (Minn. 1989), the juvenile court required a father to admit, as a prerequisite to obtaining even closely supervised visitation with his children, that he had sexually abused the children. The Minnesota Court of Appeals held that such was violative of the father's privilege against compelled self-incrimination. The Supreme Court of Minnesota affirmed on the same grounds but wrote separately because it believed that "the second part of our holding in [*Matter of Welfare of*] *J.W.*, that the privilege does not protect the parent from the consequences of any failure to succeed in a court-ordered treatment plan merits equal empha-

sis." *Id.* at 886. In the first part of its holding in *Matter of Welfare of J.W.*, the court held that it is a violation of a parent's Fifth Amendment privilege for a court to directly require the parent to admit guilt as a part of a court-ordered treatment plan.

In *Mullin v. Phelps*, 647 A.2d 714 (Vt. 1994), the family court ordered that custody of the parties' two minor children be transferred from the father to the mother and that all contact be cut off between the father and the children unless the father acknowledged abusing the children. The Supreme Court of Vermont, citing the Minnesota court, stated:

> While a court may require abusive parents to submit to therapy, and parental rights may be terminated without violating the fifth amendment based on the fact that the parents' denial of their problem prevented effective therapy, the court's specific condition requiring the father to acknowledge conduct for which he could be prosecuted must be stricken.

*Id.* at 724-25.

Read together, these cases stand for the proposition that a court cannot order a parent in a juvenile proceeding to admit to criminal conduct for which he or she could be later prosecuted. Such would be contrary to the privilege against self-incrimination. However, a parent's rights may be terminated as a result of failing to undergo meaningful therapy—even if that includes admitting past conduct which may be criminal.

I find controlling a decision of the Minnesota Court of Appeals, even though it was announced prior to *Matter of Welfare of J.W., supra.* In *Matter of Welfare of S.A.V.*, 392 N.W.2d 260 (Minn. App. 1986), the juvenile court found, in essence, that the parents had caused serious injury to their children. In a dispositional order, the court continued legal custody of the children in foster care and found that " 'the parents need to acknowledge the causes of the children's injuries before any meaningful change will occur in the care and treatment they provide to the children.' " *Id.* at 262. The court of appeals framed the issue as whether the dispositional order requiring the parents to cooperate in the evaluation process violated the father's constitutional right to be free from compelled self-incrimination. In holding that the dispositional order did not

violate the father's privilege against self-incrimination, the court stated:

> Termination of appellant's parental rights is a very real possibility if he does not cooperate with counseling because the state will be unable to work with him toward resumption of his parental responsibilities. The trial court's finding that the parents need to recognize the cause of the children's injuries before any meaningful change can occur recognizes that a parent who acknowledges the need for professional help is more amenable to treatment than one who denies the need for help. . . . Termination in such a situation is not, however, a sanction for exercise of a constitutional right, but simply the necessary result of failure to rectify parental deficiencies. Although the state cannot require appellant to waive his constitutional right, that does not mean it must relinquish its right and obligation to protect these children.

*Id.* at 264.

Such reasoning was followed in *In Interest of H.R.K.*, 433 N.W.2d 46 (Iowa App. 1988), where the juvenile court terminated parental rights because the parents had failed to complete a sexual abuse treatment program which required that they admit to the sexual abuse of their children. Citing the above quote from *Matter of Welfare of S.A.V.*, *supra*, the Iowa Court of Appeals concluded that the parents' due process argument was without merit. And in *Matter of Tammy B.*, 185 A.D.2d 881, 587 N.Y.S.2d 377 (1992), the court terminated a father's parental rights, based on permanent neglect. In upholding the judgment, the court found:

> [T]he father was found to have sexually abused her. The Family Court directed him to seek sexual offender therapy if he wanted to reunite himself with his daughter.
>
> The record reflects that although the father attended therapy sessions, due to his lack of acknowledgment of guilt, the cause of abuse was never explored and he was unable to gain any insight to his behavior. Since the father failed to make any therapeutic progress, we find that he cannot make an adequate plan for Tammy's future. Thus, Tammy is a permanently neglected child . . . .

185 A.D.2d at 883, 587 N.Y.S.2d at 379.

These authorities further support my position that courts may terminate parental rights based on the parents' refusal to undergo therapy, which requires that they stop denying and admit their past harmful conduct, without impinging upon the parents' privilege against self-incrimination. The termination of parental rights is not a sanction for the exercise of a constitutional right, but, rather, the necessary result of the failure of the parents to rectify their parental deficiencies. In view of the judicial determination that Suzette did sexually abuse the children, her protestations that she is innocent must be ignored in any proceeding, except a criminal one where the burden of proof would be greater.

The record reveals that the repercussions of a parent's failure to admit to past harmful conduct are great. At trial, Dr. Joseph Stankus, a clinical psychologist, testified that it is "hard" to rehabilitate a sexual abuser unless there is an admission that he or she was involved in the abuse. He further testified that since Suzette refuses to admit the sexual abuse, it is impossible to start individual or family therapy working toward the goal of reintegrating Suzette with the children. According to Stankus, family therapy could only begin when two "variables" were met: (1) when Suzette had "worked through enough of her apparent abuse of the children" and (2) when the children felt less fearful of their mother. When asked about the effect that a parent's refusal to acknowledge past sexual abuse had on the children, Stankus opined with a reasonable degree of medical certainty that it destroys the children's trust even more, it makes the children feel like their parent is not protecting them, and it retraumatizes them.

Stankus' testimony was echoed by Kay McMahon, a child and family therapist. McMahon testified that it is "almost impossible" to resolve the children's issues either without Suzette acknowledging and working through the issues or without visitation being suspended. McMahon further testified that the children recognize Suzette as a perpetrator and that her denial of the abuse blocks

> any progress. It creates confusion . . . of their own real[i]ty. . . . [A]ny trust that might be there between the children and their mother would totally be destroyed. They

have distinct memories, especially Clifford, and to have mother say I didn't do it, [her live-in boyfriend] did, would then have — it puts Clifford in a position of either having to choose whether he's crazy or his mother's a liar and neither one of those positions is a healthy position for a child.

It seems clear to me that no responsible public official is going to return the children to Suzette until experts determine that she is no longer a danger to her children. The chances of reunification are slim to none if she does not fully participate in her own treatment and therapy. The evidence in the record is clear that there is no chance of reconciliation without Suzette participating in therapy and that one of the initial steps of such therapy is her admission that she sexually abused her children. A child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. *In re Interest of C.N.S. and A.I.S.*, 234 Neb. 406, 451 N.W.2d 275 (1990).

While a psychotherapist did testify that it is possible for Suzette to begin therapy prior to admitting involvement in the abuse, he admittedly was not an expert in sexual assault issues dealing with children. Moreover, his testimony contradicts the great weight of the evidence. I think that there is no evidence to establish any hope that Suzette will be able to have custody of her children without successful therapy. She has had more than 18 months to change and has failed to do so. I therefore think the juvenile court was justified in accepting the testimony of Stankus and McMahon, and upon a de novo review, I would so accept. Suzette's participation in therapy may result in her making admissions that could result in her being convicted of a crime, but there is no evidence that the purpose of the termination proceeding is to force an admission or to sanction her for failing to admit the sexual abuse. Here, it is undisputed that Suzette did not participate in the Parents United program. Thus, I would conclude that Suzette's parental rights should be terminated under § 43-292(7).

*Evidence Under § 43-292(2).*

I additionally believe that there are grounds to terminate Suzette's parental rights under § 43-292(2) for "substantially

and continuously or repeatedly neglect[ing] the [children] and refus[ing] to give the [children] necessary parental care and protection." A parent's failure to take proper measures to protect children from abuse by another furnishes sufficient cause to terminate parental rights under subsection (2). *In re Interest of C.P.*, 235 Neb. 276, 455 N.W.2d 138 (1990). The evidence of Suzette's refusal to acknowledge the sexual abuse is also relevant here. According to the experts, Suzette's failure to acknowledge the past sexual abuse would confuse the children, destroy their trust, and retraumatize them. Clearly, Suzette, by maintaining her innocence in the face of a previous order which found to the contrary, has not taken proper measures to protect her children from further abuse. As such, she would not be able to give the children the necessary parental care and protection that they need and deserve. Suzette's parental rights should also be terminated under subsection (2).

The evidence in the record establishes that Suzette cannot undergo successful therapy unless she admits she abused her children. In my opinion, by the very nature of the situation, the conditions cannot change unless Suzette admits her conduct and undergoes successful therapy. However, it is entirely possible that even if Suzette admits her conduct and engages in prolonged therapy, the State may still be able to prove that successful therapy is not possible in spite of her admissions. If I were the juvenile court judge and this case were returned to me with the direction stated in the majority opinion, in view of the evidence in the record, I would have no idea how to proceed, except to keep the children in foster care until Suzette agrees to admit her misconduct to a therapist or until the children reach the age of majority. For all of these reasons, I would affirm.